**SCENIC HUDSON PRESERVATION CONFERENCE et al., Plaintiffs,**

v.

**Howard H. CALLAWAY, Individually and as Secretary of the Army, Department of the Defense, U.S.A., et al., Defendants.**

No. 73 Civ. 4276.

United States District Court,
S. D. New York.

Dec. 28, 1973.

Berle, Butzel & Kass, New York City, Winer Neuburger & Sive, New York City, for plaintiffs.

Paul J. Curran, U. S. Atty., S. D. N. Y., New York City, for defendants Howard H. Callaway, Lt. General William C. Gribble, Jr., and Colonel Harry W. Lombard.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for Consolidated Edison Co. of New York, Inc.

## MEMORANDUM

LASKER, District Judge.

This suit opens the third round of federal litigation involving the controversial Storm King project[1] since approval for its construction was first sought in 1963.[2] The proposed facility is a pumped storage hydroelectric generating plant of approximately 2,000 megawatts capacity to be constructed by the Consolidated Edison Company ("Con Ed") on the west bank of the Hudson River at Storm King Mountain in the vicinity of Cornwall, New York. It is primarily intended to provide electric power during periods of peak demand for New York City and parts of Westchester County.

The Storm King project was first licensed by the Federal Power Commission ("FPC") in March, 1965. 33 F.P. C. 428. That license, however, was set aside by the Court of Appeals for this Circuit and Con Ed's application was remanded to the FPC for further proceedings. Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (2d Cir. 1965), cert. denied sub nom. Consolidated Edison Co. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 88 S.Ct. 1462, 16 L.Ed.2d 540 (1966) ["*Scenic Hudson I*"]. Construction and operation of the project, as presently proposed, was licensed on August 19, 1970 (44 F.P.C. 350), and issuance of the license was sustained by the Court of Appeals in October, 1971. Scenic Hudson Preservation Conference v. Federal Power Commission, 453 F.2d 463 (2d Cir. 1971), cert. denied, 407 U. S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972) ["*Scenic Hudson II*"]. Con Ed had intended to begin construction in November or December of this year, but awaits decision of the present motions.

The phase of construction which this case involves concerns excavation or dredging in the Hudson River in order to construct intake facilities for the project's underground powerhouse and deposit or filling of the excavated or dredged materials into the Hudson. The latter would create new land along the river which would be conveyed to the Village of Cornwall for use as a park. Plaintiffs, three conservationist organizations and one individual, seek to enjoin these activities unless Con Ed obtains permits for them from the Army Corps of Engineers ("the Corps").

At the outset of the present case, plaintiffs moved for preliminary injunctive relief. Thereafter the Corps and Con Ed cross-moved to dismiss the complaint, the latter also cross-claiming against the former and counter-claiming against plaintiffs for a declaratory judgment that no Corps permits are required. Plaintiffs subsequently moved for summary judgment granting them permanent injunctive and declaratory relief and for dismissal of Con Ed's counterclaim. The parties are agreed that no genuine issue of material fact exists to prevent the disposition of the case by summary judgment on the merits.

Plaintiffs contend that Con Ed is required to obtain permits from the Corps for its proposed activities under two

1. Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (2d Cir. 1965), cert. denied sub nom. Consolidated Edison Co. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 88 S.Ct. 1462, 16 L.Ed.2d 540 (1966) [*Scenic Hudson I*] ; Scenic Hudson Preservation Conference v. Federal Power Commission, 453 F.2d 463 (2d Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972) [*Scenic Hudson II*].

2. Con Ed originally filed its application with the FPC in January 1963. Bergen Affidavit, par. 4(a).

provisions, Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403) and Section 404 of the Federal Water Pollution Control Act, as amended in 1972 (33 U.S.C. § 1344). They argue that these sections on their face require obtaining permits and that nothing in the acts themselves or in any other act relieves Con Ed of this obligation.

Con Ed maintains that the permit authority of the Corps under the 1899 Act as to hydroelectric projects was removed by the Federal Power Act of 1920, 16 U.S.C. § 792 et seq., which vested licensing power over such projects solely in the FPC. As to the 1972 Amendments to the Federal Water Pollution Control Act,[3] Con Ed argues that the Storm King project is exempt from the permit requirements of § 404 of the Act because 1) that section is merely an environmental adjunct to Section 10 of the 1899 Act and applies only to discharges resulting from the dredging of ship channels in navigable waters; 2) Congress did not intend § 404 to apply to FPC licensed activities and the proposed Corps regulations under § 404 do not in fact apply to such activities; and 3) applying § 404 to projects previously licensed by the FPC would violate the "Grandfather" clause (§ 28) of the Federal Power Act.

The Corps originally granted three permits to Con Ed pursuant to § 10 of the 1899 Act. These permits have expired by their own terms and the Corps now maintains that granting them in the first instance was an administrative error since no permit is required under the 1899 Act. As to § 404, although at the outset of this suit the Corps took the position that it was inapplicable to the Storm King project, its present posture is that Con Ed is required to seek a permit under that section.

## I. Rivers and Harbors Act.

Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, provides:

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; . . . and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity . . . of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

Con Ed concedes that on its face § 10 requires a permit for its proposed activities at Cornwall, but argues that the Federal Power Act has superseded § 10 and eliminated any obligations to secure a permit.

The 1920 Federal Water Power Act, which became Part I of the present Federal Power Act,[4] gave the FPC licensing control over the construction and operation of hydroelectric projects. Specifically, the FPC was authorized

"to issue licenses . . . to any corporation organized under the laws of . . . any State . . . for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction. . . . ." § 4(e), 16 U.S.C. § 797(e).

Furthermore, § 23 of the Act made it unlawful to construct any hydroelectric plant without an FPC license. 16 U.S.C.

---

3. The Federal Water Pollution Control Act Amendments of 1972 are hereinafter referred to as "the Amendments" or "the 1972 Amendments."

4. Both the Federal Water Power Act and the Federal Power Act are hereinafter referred to as "the Power Act."

§ 817. Since the Storm King project's construction unquestionably falls under the jurisdiction of the FPC, there is no doubt that an FPC license is required for it. Such a license has been obtained and the sole remaining question is whether its acquisition relieves Con Ed of any obligation under the 1899 Act.

Con Ed argues that the Federal Power Act vests *exclusive* jurisdiction over hydroelectric plants in the FPC and denies any other federal agency licensing power over projects within its jurisdiction. It supports this argument by reference to § 29 of the Federal Power Act which states that "All Acts or parts of Acts inconsistent with this chapter are repealed." 16 U.S.C. § 823. Con Ed submits that Corps licensing of hydroelectric plants under § 10 of the 1899 Act is inconsistent with § 29 of the Federal Power Act and that the former, to the extent that it applied to hydroelectric plants, has been repealed by the latter. Plaintiffs contend that the statutes are not inconsistent and licenses are required under both.

In the most literal sense, the two Acts are not inconsistent since additional licensing by the Corps does not detract from the licensing power accorded the FPC under § 4(e) of the Power Act. Con Ed's argument is more far-reaching, however, since it flows from the alleged over-all purpose rather than any specific provision of the Power Act. The thrust of Con Ed's approach is simply that in enacting the Power Act Congress intended to do away with piecemeal licensing of hydroelectric plants, so that duplicative licensing violates the spirit if not the words of the Act.

Fortunately, we are not required to speculate in the dark. Both legislative history and judicial interpretation of the Power Act are extensive and leave little doubt that Con Ed's approach more closely accords with the Act than that urged by plaintiffs.

Taking the legislative history first, we note that the House Report discusses the bill, as quoted in Con Ed's brief, states:

> "The salient features of the bill herewith reported are the creation of a commission known as the Federal Power Commission, to be composed of the Secretaries of War, Interior and Agriculture. To the Commission are given the powers *heretofore exercised* by the Secretaries in connection with water power development under their several jurisdictions . . . .

> The [Water Power] bill . . . proposes a method by which the water powers of the country, wherever located, can be developed by public or private agencies under conditions which will give the necessary security to the capital invested and at the same time protect and preserve every legitimate public interest. It provides that the administration of water power within Federal jurisdiction, which have hitherto been handled independently by three separate departments [War, Agriculture and Interior] *in order that duplication may be avoided*, that a common policy may be pursued, and that the combined efforts of the three agencies may be directed toward a constructive national program of intelligent, economical utilization of our resources". House Rep. No. 61, 66th Cong. 1st Sess., at 5 (emphasis added).

Equally noteworthy is the testimony before the House Water Power Committee by Mr. O. C. Merrill of the Department of Agriculture in which he said:

> "The first step in carrying out the purpose of the bill , . . . should consist in coordinating the activities of the three departments which have to do with water power in order that *whatever is done by existing agencies may be done under a consistent plan with a definite end in view that there may be no duplication of work, overlapping of functions or conflict of authority.* It is proposed to accomplish this by the creation of a commission

composed of the Secretaries of War, Interior and Agriculture . . . . " House Water Power Committee Hearings, March 18 to May 15, 1918, 65th Cong. 2d Sess. (emphasis added).

The desire to avoid duplication of administrative effort without destroying the essential authority of a relevant agency is reflected in § 4(e) of the Power Act which provides that "no license affecting the navigable capacity of any navigable waters of the United States shall be issued until the plans of the dam or other structures affecting the navigation have been approved by the Chief of Engineers and the Secretary of the Army." 16 U.S.C. § 797(e). If, instead of the interagency cooperation which this proviso mandates, a separate licensing of hydroelectric plants were intended under both Acts, duplication of efforts would result in not one, but two ways. First, two federal agencies would be required to license the same project. Second, the same agency (the Corps) would be required both to approve plans submitted to the FPC and to issue a separate permit of its own.

Before turning to a discussion of case law under the Power Act, we note the language of an early interpretation of the Act by the Attorney General. In support of his opinion that the Secretary of Agriculture's authority to approve the transfer of preexisting permits was, by the Power Act, terminated and vested instead in the FPC, the Attorney General said:

"It seems clear that it was the purpose of Congress to bring under this Act all future power development within the jurisdiction of the United States and to concentrate in the hands of the Federal Power Commission all the administrative authority thereover which was in part previously distributed among the Secretaries of the Interior, Agriculture, and War. It is also clear that no further original permits, at least, were thereafter to be issued by the Secretaries. It is believed that practically all the permits issued by them are limited in time; and when they expire new licenses will be issued by the Commission and not by the Secretaries, respectively. It is therefore evident that the intent of the Act, as well as its necessary operation, is to ultimately bring under the new law and under the control of the Federal Power Commission all existing as well as all future developments." 32 Op.Atty.Gen. 525, 528 (1921).

This approach has consistently been validated and adopted by courts faced with the job of interpreting the Act. In First Iowa Hydro-Electric Cooperative v. Federal Power Commission, 328 U.S. 152, 180, 66 S.Ct. 906, 919, 90 L.Ed. 1143 (1946), the Court described the Federal Water Power Act of 1920 in the following words:

"It was the outgrowth of a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so, instead of the piecemeal, restrictive, negative approach of the River and Harbor Acts and other federal laws previously enacted." *See also* United States ex rel. Chapman v. Federal Power Commission, 345 U.S. 153, 167–168, 73 S.Ct. 609, 97 L.Ed. 918 (1953).

More recently, the Court has said:

"The central purpose of the Federal Water Power Act was to provide for the comprehensive control over those uses of the Nation's water resources in which the Federal Government had a legitimate interest; these uses included navigation, irrigation, flood control, and, very prominently, hydroelectric power—uses which, while unregulated, might well be contradictory rather than harmonious." Federal Power Commission v. Union Electric Co., 381 U.S. 90, 98, 85 S.Ct. 1253, 1258, 14 L.Ed.2d 239 (1965).

As the Court of Appeals for the Eighth Circuit stated:

"The various Acts of Congress forming the background for the Federal Water Power Act of 1920, as amended by the 1935 Act, are indicative not only of an intention to fully develop the water power resources, and to protect the national interest, but of an intention to centralize the authority over such resources in one Government agency.

\* \* \* \* \* \*

As we view the history of the water legislation, . . . we are forced to conclude that such legislation was designed to vest in the Commission for the future, the control and jurisdiction which Congress had previously exercised." Northwest Paper Co. v. Federal Power Commission, 344 F.2d 47, 51–52 (8th Cir. 1965).

Finally, in an earlier case involving the Storm King project itself, the Court of Appeals for this Circuit observed that "[i]n the Federal Power Act Congress granted the Commission 'sweeping authority and a specific planning responsibility.'" *Scenic Hudson II*, 453 F.2d at 467.

■ In light of this legislative history and judicial gloss, we have no hesitation in holding that the Federal Power Act preempted the Corps' § 10 authority to grant permits for the construction of hydroelectric plants such as the Storm King project and vested sole licensing authority in the FPC, to be exercised, when appropriate (as it was here), with the cooperation and approval of the Corps.

The only shadow of doubt on what is otherwise a clear picture is cast by the actions of the Corps itself with regard to Storm King. Although the Corps reviewed both of Con Ed's applications for FPC licenses, as provided in § 4(e) of the Power Act, and approved the plans in both instances in 1963 and 1966 (*see* Exhibits B and G to Affidavit of T. Gorman Reilly), it also issued three permits separately and directly to Con Ed,

one in 1963 and two in 1965, approving various aspects of the proposed construction (Exhibits C, D and E to Affidavit of T. Gorman Reilly). If these actions of the New York District Engineer represented an official Corps policy that § 10 permits were required for FPC-licensed projects, they would raise serious questions as to preemption by the FPC, since an agency's long-standing interpretation of its own powers carries considerable weight. Wisconsin v. Illinois, 278 U.S. 367, 413, 49 S.Ct. 163, 73 L.Ed. 426 (1929); Guthrie v. Alabama By-Products Co., 328 F.Supp. 1140, 1147–1149 (N.D.Ala.1971).

However, the present position of the Corps, expressed in both its current and its proposed regulations, is that no § 10 permit is required for an FPC-licensed project. The former states that "the functions of the Chief of Engineers and the Secretary of the Army to authorize non-Federal water power projects . . . were transferred to the Federal Power Commission by the Federal Water Power Act of 1920 (41 Stat. 1063)." 33 CFR § 209.120(d)(9). The latter provides that:

"[W]here such structures will affect the navigable capacity of any navigable waters of the United States (as defined in 16 U.S.C. 796), the plans for the dam or other physical structures affecting navigation must be approved by the Chief of Engineers and the Secretary of the Army. In such cases, the interests of navigation should normally be protected by a recommendation to the FPC for the inclusion of appropriate provisions in the FPC license rather than the issuance of a separate Department of the Army permit under 33 U.S.C. 401 et seq." 38 Fed.Reg. 12218 (May 10, 1973).

Furthermore, James E. DeSista, Chief of the Regulatory Functions Branch of the Corps, has submitted an affidavit in which he states that no regulation issued since 1920 required the Corps to issue a § 10 permit to an FPC-licensed project and that "[a]s applications for

FPC licenses are coordinated with the Corps of Engineers . . . it has been the policy of the Corps of Engineers to include in the Corps response to FPC all requisite information and recommendations, and hence it has been filed [*sic*] unnecessary to issue a separate Section 10 Permit" (par. 7). He notes further that authority to issue permits has been delegated by the Corps to its Division and District Engineers and that "there have been instances where a District or Division Engineer has issued duplicate permits in connection with FPC projects" (par. 8). As to these, he states that "[t]he issuance of these few permits were made by the local District or Division Engineer under his delegated authority and were not a result of any policy decision or directive from [the Office of the Corps of Engineers]" (*id.*).[5]

■ We conclude, accordingly, that Con Ed and the Corps are correct that no permit is required under § 10 of the Rivers and Harbors Act for construction of the Storm King project.

## II. Federal Water Pollution Control Act.

■ Section 404 of the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1344(a), requires a permit for the discharge of "dredged or fill material" into navigable waters. It provides:

(a) The Secretary of the Army, acting through the Chief of Engineers, may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.

(b) Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary of the Army (1) through the application of guidelines developed by the Administrator, in conjunction with the Secretary of the Army, which guidelines shall be based upon criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section 1343(c) of this title, and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

(c) The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary of the Army. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection."

Since, as discussed above, Con Ed's activities along the Hudson at Cornwall

---

5. Plaintiffs argue that the DeSista affidavit does not establish what the policy of the Corps was from 1920 to 1968 (when the current regulation stating that § 10 permits would not be required for FPC licensed projects was promulgated), but merely describes current practice and hypothesizes that past practice was similar to it. To the contrary, we agree with defendants that

DeSista is describing past as well as present practice and that his long experience in the regulatory branch of the Corps provides an adequate basis for his conclusions. Since this point is in any event a fairly peripheral one, we think no purpose would be served in conducting further discovery on it as requested by plaintiffs.

will entail the discharge of a large quantity of dredged or fill material into the Hudson, the statute on its face requires Con Ed to obtain a permit for its activities. Con Ed has, however, assembled a barrage of arguments against application of the section to its Cornwall project.

First, Con Ed asserts that § 404 is merely an environmental adjunct to § 10 of the 1899 Act and applies only to dredge and fill discharges resulting from the dredging of ship channels in navigable waters covered by § 10. This position is supported neither by the language nor the legislative history of § 404 or the 1972 Amendments to the Water Pollution Control Act as a whole.

The stated purpose of the Amendments is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 101(a), 33 U.S.C. § 1251(a). Congress set out to accomplish this objective by prohibiting all discharges of pollutants except as specifically provided. Section 301(a) of the Amendments states that except as provided in the Act "the discharge of any pollutant by any person shall be unlawful." § 301(a), 33 U.S.C. § 1311(a). Under § 502(6), the term "pollutant" is defined as including not merely "dredged spoil", but also "rock" and "sand" from any source. 33 U.S.C. § 1362(6). Section 404 is one of the exceptions specifically mentioned in § 301(a). Moreover, the conference report on § 404 states that "[f]ailure to obtain a permit under this section, or failure to comply with•the requirements of such a permit, would be a violation of section 301(a) and enforceable under section 309." 1 Legislative History of the Water Pollution Control Act Amendments of 1972, p. 325 (1973).

Bearing in mind the purpose of the Amendments, a reading of sections 301(a) and 404 indicates that Congress intended to ban outright the discharge of dredged spoil, rock and sand (§§ 301(a) and 502(6)), unless a permit is obtained under § 404 from the Corps with the approval of the Environmental Protection Administrator.

Con Ed asks that we read into this statutory scheme a double exemption. It argues that it is subject neither to the permit requirements of § 404, nor to the prohibition of § 301(a). We need not speculate, however, about how Con Ed would avoid the ban of § 301(a) if we were to find § 404 to be inapplicable, because we find that § 404 does apply.

Nothing in the language or history of the statute validates Con Ed's hypothesis that, since the Corps issues permits under both §§ 10 and 404, the latter must have been intended only to require that, in carrying out its supervisory activities over the dredging of ship channels under § 10, the Corps would have in mind the environmental goals embodied in the 1972 Amendments. To the contrary, the invalidity of this position is demonstrated by a simple reading of the section, since, if Con Ed's assumption were correct, § 404 would prohibit only the discharge of "dredged materials", i. e., materials dredged out of ship channels, whereas by its own terms it covers "dredged and fill materials." To assume that Congress meant nothing by the use of the word "fill" in addition to "dredged" would be unwarranted, especially since the original Amendments referred only to "dredged spoil" (S. 2770, 92d Cong., 1st Sess., § 402(m)), "fill" having been subsequently inserted. Con Ed offers no reason for its insertion and we can think of none which supports its assumption that the provision covers only dredged materials and then only materials dredged from ship channels.

█ A far more difficult point is raised by Con Ed's assertion that Congress could not have intended § 404 to apply to hydroelectric power plants because of the comprehensive regulatory power which under the Federal Power Act is to be wielded solely by the FPC. In this context, Con Ed relies on § 511(a) of the Amendments which provides:

"This chapter shall not be construed as (1) limiting the authority or functions of any officer or agency of the United States under any other law or

regulation not inconsistent with this chapter." 33 U.S.C. § 1371(a).

The argument holds up only if two predicates are valid: 1) Application of § 404 to hydroelectric projects would impair the authority of the FPC and 2) exercise of exclusive authority by the FPC is not inconsistent with the Amendments. A certain illogic inheres in this position, since the Amendments and the Power Act appear consistent only if the former do *not* diminish the exclusive authority granted by the latter. Con Ed, however, suggests a way out of the apparently sophistic impasse by maintaining that the Power Act and the Amendments are consistent with each other, because under the former the FPC performs all the functions which would be fulfilled by the Corps and the Administrator under the latter.

On closer analysis, this escape route proves to be a dead end street, because although under the Power Act the FPC can perhaps accomplish everything sought by the Amendments, it is not obligated to do so by the Power Act itself. In fact, Con Ed points to no Power Act provision that would require the FPC to satisfy literally or even substantially the demands of § 404. On the other hand, § 404 conditions discharge of dredged or fill materials on approval by two federal agencies, granted pursuant to specific guidelines designed to protect the environment. Their approval is mandatory under the 1972 Amendments, whereas FPC compliance with § 404 would be merely voluntary. To this extent, the Acts are inconsistent.

Regardless of these conclusions, Con Ed would infer an exception from the Amendments for hydroelectric plants on the theory that Congress could not have intended to interfere with the jurisdiction of the FPC in view of the long settled policy, discussed above, of allowing that agency unique control over the production of hydroelectric power. The argument is persuasive at first blush, but even more plausible is plaintiffs' contention that Congress would not design an Act which on its face is all-inclusive, but

for specifically enumerated exceptions, and yet intend to establish an unmentioned exception of the scale suggested here. Without any indication that Con Ed's reading of the Congressional will is accurate, the carving out of so major an exception would be improper. If this was Congress' intention and the omission is mere oversight, the remedy rests in Congress' hands, and Congress has shown, by its recent amendments to the Alaska pipeline legislation, that it will not hesitate to remove an obstacle to energy production when it believes a change of requirements is necessary in the public interest.

Con Ed also cites regulations proposed by the Corps, 33 CFR § 209.120, 38 Fed.Reg. 12217 (May 10, 1973), as further grounds for its argument that the Power Act's provisions, exclusively, apply to its project. In this it runs counter to the Corps' own interpretation of its regulations, which is that, notwithstanding the Power Act, Con Ed is required to comply with § 404. Accordingly, Con Ed begins with a strike against it, since an agency's interpretation of its own regulations must be accorded great weight. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Power Reactor Development Co. v. International Union of Electrical Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L. Ed.2d 924 (1961).

The applicable proposed regulation, 33 CFR § 209.120(c)(6), reads as follows:

"The Federal Power Act of 1920 (41 Stat. 1063; 16 U.S.C. 791a et seq.), as amended, authorizes the Federal Power Commission (FPC) to issue licenses for the construction, operation, and maintaining of dams, water, conduits, reservoirs, powerhouses, transmission lines, and other physical structures of a power project. However, where such structures will affect the navigable capacity of any navigable waters of the United States (as defined in 16 U.S.C. 796), the plans for the dam or other physical structures affecting navigation must be approved by the Chief of Engineers and

the Secretary of the Army. In such cases, the interests of navigation should normally be protected by a recommendation to the FPC for the inclusion of appropriate provisions in the FPC license rather than the issuance of a separate Department of the Army permit under 33 U.S.C. 401 et seq. [Rivers & Harbors Act of 1899]. As to any other activities in navigable waters not constituting construction, operation, and maintenance of physical structures licensed by the FPC under the Federal Power Act of 1920, as amended, the provisions of 33 U.S.C. 401 et seq. remain fully applicable. In all cases involving the discharge of dredged or fill material into navigable waters . . . Department of the Army permits under section 404 of the Federal Water Pollution Control Act . . . will be required." 38 Fed.Reg. at 12218.

Con Ed contends that the phrase "In all cases" in the last quoted sentence refers to non-FPC licensed activities as discussed in the preceding sentence. An equally, if not more plausible reading of the phrase would be that it means quite simply what it says: that "[i]n *all* cases involving the discharge of dredged or fill material into navigable waters . . . permits under § 404 . . . will be required." *Id.* (emphasis added). This is the meaning put forward by the Corps itself, and we are satisfied that it is correct.

Con Ed further relies on another proposed Corps regulation, 33 CFR § 209.-120(e), which states:

"1) The provisions of law cited in paragraph (b) of this section [which include § 10 of 1899 Act and § 404 of the Amendments], requiring Department of Army authorizations, are considered applicable to all structures or work in the navigable waters of the United States except for . . . structures licensed under the Federal Power Act of 1920. . . .

2) In addition, Department of the Army authorizations will be required for the discharge of dredged or fill material into the navigable waters. . . ." 38 Fed.Reg. at 12219.

Con Ed urges that, in light of subsection (e)(1), subsection (e)(2) applies only to structures not licensed under the Power Act. However, the use of "In addition" in (e)(2) is also consistent with the interpretation urged by the Corps that (e)(2) applies independently of (e)(1), and we accept the Corps' interpretation. Accordingly, we find that compliance with § 404 of the Federal Water Pollution Control Act is required under both the Act and the regulations proposed thereunder even of structures licensed by the FPC.

Con Ed's final argument is that even if this conclusion is correct, § 404 cannot apply to a project such as Storm King, which was licensed prior to the passage of the Amendments, because section 28 of the Power Act provides:

"The right to alter, amend, or repeal this chapter is expressly reserved; but no such alteration, amendment, or repeal shall affect any license theretofore issued under the provisions of this chapter, or the rights of any licensee thereunder." 16 U.S.C. § .822.

The answer to Con Ed's argument that the 1972 Amendments to the Federal Water Pollution Control Act cannot, because of this section, affect its rights under a previously issued FPC license is that the Amendments are amendments to the Water Pollution Control Act and *not* to the Federal Power Act. The Amendments constitute law of general application which affect FPC licensees no more than any other economic group. We believe that § 28 was not intended to insulate FPC licensees from the effect of general Congressional legislation for the term of their licenses, but only to protect them from ex post facto lawmaking relating specifically to FPC license requirements.

Accordingly, we hold that Con Ed is required by § 404 of the Federal Water Pollution Control Act to seek a permit from the Corps for the discharge of dredged or fill materials into the Hud-

son River, but that it is not required to obtain a permit under § 10 of the Rivers and Harbors Act of 1899. Plaintiff's motion for summary judgment granting them declaratory and permanent injunctive relief is granted as to § 404 and denied as to § 10. Defendants' motions for summary judgment dismissing the complaint are granted as to the § 10 claims and denied as to the § 404 claims. Con Ed's motion for summary judgment on its claim for a declaratory judgment that Corps permits are not required is granted as to § 10 and denied as to § 404.

Submit order on notice.