947 F.2d 386
 127 P.U.R.4th 192
 PUBLIC UTILITY DISTRICT NO. 1 OF DOUGLAS COUNTY; Public
Utility District No. 1 of Chelan County; Public
Utility District No. 2 of Grant County,
Petitioners,
and
Puget Sound Power & Light Company and Portland General
Electric Company, Petitioners-Intervenors,
v.
BONNEVILLE POWER ADMINISTRATION, Respondent.
 No. 89-70381.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 8, 1990.
Decided Oct. 17, 1991.
 
 Carol Wardell and Ray A. Foianini, Ephrata, Wash., for petitioners.
 Harvard P. Spigal, General Counsel, and Robert B. Ross, Asst. U.S. Atty., D.Or., Portland, Or., for respondent.
 Sherilyn Peterson, Perkins Coie, Bellevue, Wash., and J. Jeffrey Dudley, Portland General Elec. Co., Portland, Or., for intervenors.
 Petition for Review of a Decision of the Bonneville Power Administration.
 Before HALL, THOMPSON and LEAVY, Circuit Judges.
 LEAVY, Circuit Judge:
 
 
 1
 The Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. § 839-839h (1988), commonly known as the Northwest Power Act (the Act), authorized the States of Idaho, Montana, Oregon and Washington to enter into an interstate compact to create a policy-making and planning body for the management of electrical power and the preservation of fish and wildlife in the Columbia River Basin. The Pacific Northwest Electric Power and Conservation Planning Council (the Council) resulted. 16 U.S.C. § 839b.
 
 
 2
 The Act directed the Council to develop a Columbia River Basin Fish and Wildlife Program (the Program). 16 U.S.C. § 839b(h)(1)(A). The Program is implemented by the Bonneville Power Administration (BPA), the Corps of Engineers, the Bureau of Reclamation, and the Federal Energy Regulatory Commission (FERC) and its licensees. See Columbia River Basin Fish and Wildlife Program, as amended Feb. 11, 1987, (1987 Program) at § 104.
 
 
 3
 As part of its Program, the Council adopted a water budget that provides for additional releases of water from federal dams each spring to facilitate the migration of juvenile salmon and steelhead to the ocean. 1987 Program at § 300. The water budget limits water releases to 140 kcfs in that portion of the Columbia River upstream from the inflow of the Snake River, measured at Priest Rapids Dam. 1987 Program at § 302.
 
 
 4
 During the 1987 water budget period, the Corps of Engineers released in excess of 140 kcfs from the reservoirs at the Grand Coulee and Chief Joseph Dams, which are upstream from the Snake River inflow. These releases were made pursuant to a request by the Fish Passage Center, an office established by the Council for the management and operation of the annual water budget. 1987 Program § 303(b). The additional water was needed to assist juvenile salmon and steelhead to reach the ocean because of unusually low flows in the Snake River. As a result of the increased flows, four of the five mid-Columbia non-federal hydroelectric dams were required to spill water because the flow rates exceeded the hydraulic capacity of available generators.
 
 
 5
 The Act entitles non-federal electric power projects on the Columbia River and its tributaries to compensation for monetary costs and power losses resulting from "measures to protect, mitigate, and enhance fish and wildlife" which are "impose[d]" on the non-federal projects by federal agencies and which are "not attributable to the development and operation of such project[.]" 16 U.S.C. § 839b(h)(11)(A)(ii). In July 1987, the BPA received the first claims for compensation pursuant to the Act, for losses incurred as a result of the additional release of water that spring. Douglas County PUD claimed a loss of 2,087 megawatt hours of electricity; Chelan PUD claimed a loss of $195,870; and Grant PUD claimed a loss of $591,279. See Final Policy, 54 Fed.Reg. 31,074, 31,075 (1989). In 1989, the BPA negotiated settlements with these three PUDs. Douglas County PUD received 1,315 megawatt hours of energy; Chelan PUD received $163,134; and Grant PUD received $451,495. Id.
 
 
 6
 A draft policy for handling future compensation claims was published for public comment in the Federal Register on June 10, 1988. 53 Fed.Reg. 21,888 (1988). The BPA received comments from numerous individuals and entities, including the PUDs and the intervenors. The policy was published in its final form on July 26, 1989. 54 Fed.Reg. 31,074 (1989). It was declared effective August 28, 1989. The Final Policy states that the claims of the Douglas County, Chelan, and Grant PUDs will not form a precedent for future compensation decisions. See Final Policy, 54 Fed.Reg., at 31,074 [hereinafter "Final Policy"].
 
 
 7
 At issue in this case are definitions provided by the BPA in the Final Policy; specifically, the definitions of "measure" and "impose." Those terms are found in that portion of the Act that provides for compensation to non-federal hydroelectric projects under certain circumstances:
 
 
 8
 The Administrator and other Federal agencies responsible for managing, operating, or regulating Federal or non-Federal hydroelectric facilities located on the Columbia River or its tributaries shall--
 
 
 9
 ....
 
 
 10
 (ii) exercise such responsibilities, taking into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the Council under this subsection. If, and to the extent that, such other Federal agencies as a result of such consideration impose upon any non-Federal electric power project measures to protect, mitigate, and enhance fish and wildlife which are not attributable to the development and operation of such project, then the resulting monetary costs and power losses (if any) shall be borne by the Administrator in accordance with this subsection.
 
 
 11
 16 U.S.C. § 839b(h)(11)(A)(ii) (emphasis added).
 
 
 12
 The PUDs and intervenors contend the Final Policy adopted by the BPA for implementation of the Program is unreasonable and contrary to the Act because it improperly limits the meaning of "measure" and "impose" so as to nullify, or at least unreasonably restrict, compensation rights to which they otherwise would be entitled.
 
 
 13
 We have jurisdiction under 16 U.S.C. § 839f(e)(5).[1] We affirm in part and reverse in part.
 
 ANALYSIS
 Standard of Review
 
 14
 Section 839f(e)(2) of the Act allows the BPA's interpretation of the Act to be set aside if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; or short of statutory right. See 5 U.S.C. § 706(2)(A), (C) & (E) (1988). "This standard of review is highly deferential and assumes the agency action to be valid." Department of Water & Power of Los Angeles v. Bonneville Power Admin., 759 F.2d 684, 690 (9th Cir.1985) (citations omitted). "We accord substantial deference to the interpretation given statutes by the officers or agencies charged with their administration." Central Montana Elec. Power Coop., Inc. v. Administrator of the Bonneville Power Admin., 840 F.2d 1472, 1476 (9th Cir.1988); see Aluminum Co. of Am. v. Bonneville Power Admin., 903 F.2d 585, 590 (9th Cir.1989), cert. denied, --- U.S. ----, 111 S.Ct. 672, 112 L.Ed.2d 665 (1991). We defer to the BPA for three reasons: "First, the enabling legislation is highly technical and complex. Second, the agency was intimately involved in the drafting and consideration of the legislation, ... [and third] Congress has, for nearly half a century, monitored BPA performance in electricity regulation and allocation." Department of Water & Power, 759 F.2d at 691; see Utility Reform Project v. Bonneville Power Admin., 869 F.2d 437 at 442 (9th Cir.1989). In the final analysis, however, it is the obligation of the court to construe the statute. Central Montana, 840 F.2d at 1477.A. Statutory Construction: "Measure"
 
 The Final Policy defines "measure" as
 
 15
 a specific provision in the Program, as contemplated in the Northwest Power Act, calling upon a Federal agency or other entity to undertake actions to protect, mitigate, and enhance fish and wildlife in the Basin.
 
 
 16
 Final Policy, at 31,075.
 
 
 17
 The PUDs and the intervenors argue the BPA's definition of "measure" impermissibly narrows the scope of compensation to exclude measures taken in consideration of the Program but not explicitly required by it. We agree that the BPA erred in the Final Policy when it decided that only those measures specifically described in the Program are compensable.
 
 
 18
 In construing the Act, we look first to the statute's language. California ex. rel. State Water Resources Bd. v. FERC, 877 F.2d 743, 746 (9th Cir.1989), aff'd, --- U.S. ----, 110 S.Ct. 2024, 109 L.Ed.2d 474 (1990); Pacificorp v. Bonneville Power Admin., 856 F.2d 94, 96 (9th Cir.1988). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Prod. Safety Comm'n v. GTE Sylvania Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).
 
 
 19
 To define the meaning of "measure," we must read the language of paragraph (ii) of section 839b(h)(11)(A) in context. Title 16 U.S.C. § 839b(d)(1) of the Act requires the Council to prepare, adopt, and transmit to the Administrator a regional conservation and electric power plan. The Act requires that the plan give first priority to conservation, second priority to renewable resources, third priority to generating resources of the highest possible efficiency, and fourth priority to all other resources. 16 U.S.C. § 839b(e)(1). The plan must include seven elements, including "the program adopted pursuant to subsection (h)." 16 U.S.C. § 839b(e)(3)(F). The program subsection (h) refers to is 16 U.S.C. § 839b(h)(1)(A), which states: "The Council shall promptly develop and adopt, pursuant to this subsection, a program to protect, mitigate, and enhance fish and wildlife ... on the Columbia River and its tributaries." (Emphasis added.) The Council is required to request recommendations for "measures which can be expected to be implemented ... to protect, mitigate, and enhance fish and wildlife ... affected by the development and operation of any hydroelectric project on the Columbia River and its tributaries[.]" 16 U.S.C. § 839b(h)(2)(A). Then, the Act states that the Council shall develop a program on the basis of those recommendations and other information, and that "The program shall consist of measures to protect, mitigate, and enhance fish and wildlife affected by the development, operation, and management of such [hydroelectric facilities on the Columbia River and its tributaries.]" 16 U.S.C. § 839b(h)(5). The Act goes on to state "The Council shall include in the program measures" which will meet five listed objectives. 16 U.S.C. § 839b(h)(6). The Council is then required to consider, in developing its program, certain listed principles, including
 
 
 20
 To the extent the program provides for coordination of its measures with additional measures (including additional enhancement measures to deal with impacts caused by factors other than the development and operation of electric power facilities and programs), such additional measures are to be implemented in accordance with agreements among the appropriate parties providing for the administration and funding of such additional measures.
 
 
 21
 16 U.S.C. § 839b(h)(8)(C) (emphasis added). This last section makes it clear that there are measures other than those listed in the program that are recognized as necessary to the protection, mitigation, and enhancement of fish and wildlife and which are contemplated by the regional conservation and electric power plan.
 
 The Act requires that
 
 22
 The Administrator and other Federal agencies responsible for managing, operating or regulating Federal or non-Federal hydroelectric facilities located on the Columbia River or its tributaries shallexercise such responsibilities consistent with the purposes of this chapter and other applicable laws, to adequately protect, mitigate, and enhance fish and wildlife....
 
 
 23
 16 U.S.C. § 839b(h)(11)(A)(i). In addition, the Administrator and other Federal agencies are directed to, in the "exercise of such responsibilities, tak[e] into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the Council...." 16 U.S.C. § 839b(h)(11)(A)(ii) (emphasis added). This clearly does not mean the Administrator and other agencies are limited to the program in exercising their responsibilities under the Act. In addition to other factors, they simply must take it into account.
 
 
 24
 As we interpret the 16 U.S.C. § 839b(h)(11)(A) of the Act and the 1987 Program, the release of water in the spring to enhance the outmigration of juvenile salmon and steelhead, even a release of water in excess of the Water Budget, is a measure. All that section 839b(h)(11)(A) requires is that a measure be something that results from a federal agency taking the Program into consideration at each relevant stage of the decision-making processes, in exercising their responsibilities consistent with the Act and other applicable law.
 
 
 25
 Moreover, the Program itself consists of more than its listed measures. In addition to measures, which BPA and other federal agencies implement to protect, mitigate, and enhance fish and wildlife affected by hydroelectric dams, there are also objectives for developing and operating dams in a way designed to protect, mitigate, and enhance fish and wildlife, and coordination of fish and wildlife management, research and development. 1987 Program, section 102a-c, at 20. The Program recognizes that "if all the measures in the current program were implemented, they still would be unlikely to achieve the goal of doubling runs." 1987 Program, at 12. Thus, the Program sets forth "seven policies and a planning process for selecting new measures to add to the program." Id. Among these, efforts may be taken to "Accelerate actions to increase mainstem survival of fish" and to "Increase production through a variety of methods." Id. Simply put, factors in addition to the listed Program measures must be taken into account in the decisionmaking process. Both the Act and the 1987 Program recognize that this flexibility must be given to the Administrator and the other federal agencies.
 
 
 26
 Therefore, we reject the BPA's artificial dichotomy between a "Program measure" and a "non-Program measure." The Act is sufficiently clear that if, after considering the Program, something needs to be done by a federal agency to enhance fish survival, that is a measure, whether it is listed or not. Section 839b(h)(11)(A)(ii) does not limit compensable measures to those measures mentioned specifically in the Program.
 
 
 27
 B. Statutory Construction: "Impose"
 
 
 28
 The PUDs and intervenors also take exception to the BPA's definition of the phrase "impose upon" in section 839b(h)(11)(A)(ii). Under the definition, there is compensation only if some affirmative action is required of the non-federal projects "pursuant to an order issued by a Federal agency by force of regulation or law." Final Policy, at 31,075. The PUDs and intervenors contend the phrase includes within its ambit those actions which impose upon the non-federal projects passive burdens as well, such as the release of additional water. We affirm the BPA's interpretation of "impose upon."
 
 
 29
 Section 2(F) of the BPA's Final Policy contains the following definition:
 
 
 30
 "Impose" or "imposition" refers to the act of applying fish and wildlife obligations or restrictions upon a claimant which the claimant must implement in order to comply with applicable Federal law, regulation, or order.
 
 
 31
 Id.
 
 
 32
 Paragraph (ii) of section 839b(h)(11)(A) must be considered in conjunction with paragraph (i) to understand Congress' intent. The entire section reads:(A) The Administrator [of the Bonneville Power Administration, see 16 U.S.C. § 839a(2) ] and other Federal agencies responsible for managing, operating, or regulating Federal or non-Federal hydroelectric facilities located on the Columbia River or its tributaries shall--
 
 
 33
 (i) exercise such responsibilities consistent with the purposes of this chapter and other applicable laws, to adequately protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by such projects or facilities in a manner that provides equitable treatment for such fish and wildlife with the other purposes for which such system and facilities are managed and operated;
 
 
 34
 (ii) exercise such responsibilities, taking into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the Council under this subsection. If, and to the extent that, such other Federal agencies as a result of such consideration impose upon any non-Federal electric power project measures to protect, mitigate, and enhance fish and wildlife which are not attributable to the development and operation of such project, then the resulting monetary costs and power losses (if any) shall be borne by the Administrator in accordance with this subsection.
 
 
 35
 This section applies to all federal agencies responsible for managing, operating, or regulating hydroelectric facilities.
 
 
 36
 Paragraph (i) is all-inclusive as to what an agency must consider to protect, mitigate, and enhance fish and wildlife: the Act, the Program, and other applicable law. If an agency does what is required by paragraph (i), there is no duty for the Administrator to bear the costs or losses to the non-federal projects, because the paragraph contains no provision contemplating that a non-federal project may be ordered to protect, mitigate, and enhance fish and wildlife through measures "which are not attributable to the development and operation of such project."
 
 
 37
 Under paragraph (ii) the agencies must exercise their responsibilities by taking into account in their decisionmaking processes the program adopted by the Council. In contrast to paragraph (i), it is contemplated that in their decisionmaking they will impose measures on non-federal hydroelectric projects, and that the measures will not be attributable to the development and operation of the project. If the agency imposes measures not attributable to the development and operation of the project, the Administrator must bear the losses or costs to that project.
 
 
 38
 In our case, the Corps of Engineers released additional water at Grand Coulee Dam and Chief Joseph Dam to assist juvenile salmon and steelhead on their journey to the ocean. While we do not know under what authority the Corps released the water, it could have exercised that responsibility under paragraph (i), in which event there can be no plausible claim for compensation. No affirmative conduct was required of a non-federal hydroelectric project in order to put this plan in place.
 
 
 39
 A federal agency acting under paragraph (ii) is not just exercising its responsibility consistent with the Act, as called for by paragraph (i), but instead is taking into account the Program adopted by the Council when it imposes some measure on a non-federal project to "protect, mitigate, and enhance fish and wildlife," and that measure is not attributable to the development and operation of the project. The measure is then presumably carried out by the non-federal project.
 
 
 40
 It is our view that any losses to a non-federal project as a result of direct action by a federal agency such as the Corps under paragraph (i) is not compensable because that paragraph does not require compensation. Federal action under paragraph (ii), on the other hand, contemplates the imposition of a measure on the non-federal hydroelectric project. The project must then itself carry out the measure to protect, mitigate, and enhance fish and wildlife, and the Administrator must compensate the project. Thus we find the BPA's definition of "impose" entirely reasonable in terms of the statute because it recognizes this important difference between the two paragraphs in section 839b(h)(11)(A).
 
 
 41
 The dissent argues that FERC is the only federal agency authorized to require non-federal projects to take affirmative action. The import of this argument is that because paragraph (ii) speaks of multiple federal agencies imposing measures, Congress cannot have meant that compensation is due only when affirmative conduct is required.
 
 
 42
 We cannot agree. FERC is not the only federal agency that can require non-federal hydroelectric projects to take affirmative action to enhance fish and wildlife.
 
 
 43
 16 U.S.C. §§ 803(a) and (b) (1988 & Supp.1990), cited by the dissent for the proposition that only the FERC can require affirmative conduct, deal only with the conditions for licensing electric power projects.[2] However, the licensing of hydroelectric facilities is not the extent of government regulation of non-federal projects on the Columbia River: federal agencies other than FERC, most notably the Corps of Engineers, are involved in regulating private electric utilities in areas other than licensing.
 
 
 44
 A federal district court and a federal appellate court have held that section 404 of the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1344, requires a non-federal utility to obtain a permit from the Secretary of the Army to discharge dredged or fill materials from any source into the Nation's waters. Scenic Hudson Preservation Conference v. Callaway, 370 F.Supp. 162, 171-72 (S.D.N.Y.1973), aff'd, 499 F.2d 127 (2d Cir.1974).[3] The district court decided this issue after first holding that the Corps could not issue permits for the construction of hydroelectric projects because the Federal Power Act preempted the Corps' authority in the licensing of such projects. The dissent focuses only on the first issue.
 
 
 45
 The issue that arose in Scenic Hudson was whether a Corps permit was required for the discharge of dredge and fill material incidental to hydroelectric construction despite prior licensure by the forerunner of FERC, the Federal Power Commission (FPC). In deciding that a permit was required from the Corps, the courts rejected the argument that "Congress could not have intended to interfere with the jurisdiction of the FPC in view of the long settled policy ... of allowing that agency unique control over the production of hydroelectric power." Id. at 170. The D.C. Circuit has adopted the reasoning of Scenic Hudson, observing that FERC's jurisdiction over hydroelectric projects is not exclusive:
 
 
 46
 It follows that although the Department of Energy Organization Act undoubtedly endowed FERC richly with authority, it did not expand the jurisdiction it derived from its predecessor so as to preclude the Secretary of the Army from exerting his powers over the Nation's navigable waters.
 
 
 47
 Monongahela Power Co. v. Marsh, 809 F.2d 41, 48 (D.C.Cir.) (footnotes omitted), cert. denied, 484 U.S. 816, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987). The D.C. Circuit also recognized why First Iowa Hydro-Elec. Coop. v. Federal Power Comm'n, 328 U.S. 152, 182, 66 S.Ct. 906, 920, 90 L.Ed. 1143 (1946) does not stand for the proposition that FERC's powers are exclusive:
 
 
 48
 In First Iowa ... the [Supreme] Court sustained FPC's jurisdiction against state regulation, holding that the federal power preempted conflicting state policy. 328 U.S. at 182 [66 S.Ct. at 920]. This cannot be reliably extrapolated to the proposition that FPC's jurisdiction was exclusive with respect to another federal agency [i.e., the Corps] whose relevant powers were conferred long thereafter, and whose primary statutory mission implicates very different objectives.
 
 
 49
 Monongahela Power Co., 809 F.2d at 48 n. 75. Moreover, FERC itself recognizes that it has concurrent jurisdiction with other federal agencies as well as the states over hydroelectric development. Henwood Associates, Inc., Project No. 8142-016, 51 FERC p 61,549, at 61,558 n. 49 (1990).
 
 
 50
 Thus, for dredge and fill operations, the Corps has authority to impose upon a private utility both the requirement of a permit and the necessity of abiding by the Corps' conditions.[4] This is certainly affirmative conduct, and it may involve implementing measures for fish and wildlife enhancement.
 
 
 51
 The Corps' authority to require affirmative conduct, in some cases to enhance fish and wildlife, from non-federal hydroelectric projects is not limited to dredge and fill permits. The Corps also issues permits for dams and dikes in the navigable waters of the United States, and issues permits for structures or work in or affecting such navigable waters. 33 C.F.R. pts. 321, 322 (1990). The Corps also has significant procedures for implementing the National Environmental Policy Act (NEPA). See 33 C.F.R. pt. 230 (1990). The Corps may require affirmative conduct from private utilities in its permit processes and in its NEPA procedures.
 
 
 52
 Thus, in the process of "imposing" measures the FERC is not the only agency that may require a non-federal electric power project to take affirmative steps. The BPA recognizes, as do we, that Congress intended that agencies other than FERC may direct or require non-federal electric power projects to take affirmative action to preserve fish and wildlife. The BPA's interpretation of "impose" in 16 U.S.C. § 839b(h)(11)(A)(ii) to include only the affirmative conduct required of non-federal utilities by federal agencies is not inconsistent with the language of the statute, and is therefore reasonable.
 
 C. Claim Procedures
 1. Waiver
 
 53
 Section 5 of the Final Policy requires the Administrator to review compensation claims to determine if the right to compensation has been waived. Final Policy (II.5.A.), at 31,076. The PUDs argue that the statute does not include a waiver limitation. However, nothing in the statute suggests that a non-federal project cannot waive its right to compensation. The waiver provision in the Final Policy represents a reasonable construction of the Act by the BPA. We give deference to that construction and approve it.
 
 2. BPA Offset
 
 54
 The intervenors argue that, although the Act provides for reimbursement of losses to the extent that they result from measures imposed by federal agencies, the BPA procedure in the Final Policy impermissibly requires claimants to make an affirmative showing that the BPA is not entitled to an offset. See id. (II.5.C.). We reject this argument. There is nothing unreasonable about the BPA's interpretation requiring mitigation, offsets for benefits received, and offsets for exacerbation of losses by a claimant. We give deference to the BPA's construction of the Act in adopting these provisions in the Final Policy and we approve them.
 
 3. Licensees
 
 55
 In the Final Policy, the BPA defines a permissible claimant as "any non-Federal hydroelectric power project licensee requesting compensation under this policy." Final Policy (II.2.A.), at 31,075. However, if "a utility which is not a licensee can show that it has rights in a project which could not be represented by the project's licensee," the nonlicensee may petition the Administrator for permission to file a claim. Id. (II.3.A.).
 
 
 56
 The intervenors argue that the Act applies to anyone who can show such costs or power losses. It is not unreasonable for the BPA to limit claimants to licensees. The licensees receive the direct burdens and are an easily identifiable and limited class.
 
 
 57
 Further, the Act only refers to losses incurred by "any non-Federal electric power project;" it does not refer to other entities, such as these utilities who purchase power from the non-federal projects. Nevertheless, the Final Policy provides non-licensees an opportunity to show that a nonlicensee's rights could not be represented by the licensee.
 
 
 58
 The BPA's definition of a permissible claimant and provision for nonlicensee claims are reasonable. We approve them.
 
 4. Time Limits
 
 59
 The Final Policy requires all claims to be submitted within 120 days after a loss occurs. Final Policy (II.4.A.), at 31,075. The intervenors claim that this time period is insufficient to identify and assess losses and that 120 days is unreasonable and arbitrary.
 
 
 60
 Some time limit is appropriate. The BPA must conduct its affairs in a businesslike manner. 16 U.S.C. § 839f(b) (1988). It must be able to budget for these uncertain costs, investigate the claims while the claims are still fresh, and be able to take prompt action to avoid further losses.
 
 
 61
 Absent proof that the 120-day limit is unreasonable in a particular context, we defer to the BPA's adoption of the 120-day limit and approve it.
 
 5. Prior Notice
 
 62
 The intervenors argue that section 3(b) of the Final Policy is impermissibly vague and burdensome. The provision requires that "When any licensee of a non-Federal project becomes aware that a Federal agency may take or has taken an action which may form the basis of a claim, it should promptly notify that agency and the Administrator." Final Policy (II.3.B.), at 31,075.
 
 
 63
 We see nothing unreasonable about this notice requirement. Prompt notice may avoid an anticipated loss. It also permits early investigation and expeditious handling of claims for losses which have occurred. The notice provision is reasonable.
 
 6. Direct Causation of Losses
 
 64
 The intervenors argue that the BPA's Final Policy incorrectly limits recovery for costs and losses to those "directly" caused by or resulting from a measure. Absent more specific BPA definition or implementation of this "directness" requirement, it is unclear whether such a requirement is unreasonable. Some causation nexus is required by the Act, which limits compensation to "resulting" losses.
 
 
 65
 On the face of it, the BPA's "directness" requirement seems reasonable. However, it is conceivable that this requirement could be interpreted or implemented in an unreasonable manner. Given the posture of the present case, however, the intervenors' concern is hypothetical. There is no contention that the BPA has interpreted or implemented its "directness" requirement in an unreasonable manner. Accordingly, the issue presented by the intervenors relating to the Final Policy's "directness" requirement is unripe for judicial review.
 
 
 66
 Agency action AFFIRMED in part and REVERSED in part. Each party shall bear its own costs on appeal.
 
 
 67
 THOMPSON, Circuit Judge, concurring in part and dissenting in part:
 
 
 68
 I concur in the majority opinion except as to that portion headed "D. Statutory Construction: 'Impose'." In my view, the Bonneville Power Administration's definition of "impose upon" is unreasonable.
 
 
 69
 I agree with the BPA that the statutory language initially suggests that, to be entitled to compensation, the non-federal projects must be forced to take affirmative action. According to Webster's Third New International Dictionary (1981), "impose upon" is defined: "to force oneself esp. obnoxiously on (others)" or "to take unwarranted advantage of." "Impose" can mean "to cause to be burdened" or to force one to submit to something. Id. The Act requires compensation only where measures are imposed upon the non-federal projects, not merely burdens, or costs. 16 U.S.C. § 839b(h)(11)(A)(ii) (1988) ("other Federal agencies ... impose upon any non-Federal electric power project measures...."). The BPA can therefore find some support in the statutory text for its interpretation.
 
 
 70
 Nevertheless, I still believe the BPA interpretation is unreasonable. The Act provides that, "If, and to the extent that, such other Federal agencies" impose measures, compensation will be provided. 16 U.S.C. § 839b(h)(11)(A)(ii) (1988) (emphasis added). The term "agencies" is plural, indicating that more than one agency has the authority to impose the measures made compensable by section 839b(h)(11)(A)(ii).
 
 
 71
 Therein lies the rub. The Act expressly contemplates that several agencies can impose compensable measures, but only one agency--FERC--has the authority to require non-federal projects to take affirmative action. See 16 U.S.C. 803(a) & (b) (1988 and 1990 Supp.); see also First Iowa Hydro-Elec. Coop. v. Federal Power Comm'n, 328 U.S. 152, 182, 66 S.Ct. 906, 920, 90 L.Ed. 1143 (1946); Scenic Hudson Preservation Conference v. Callaway, 370 F.Supp. 162, 166-67 (S.D.N.Y.1973), aff'd 499 F.2d 127 (2d Cir.1974). Thus, in order to affirm BPA's interpretation we would have to believe Congress intended to silently change its longstanding position which accorded FERC exclusive control over the licenses of non-federal hydroelectric projects. See Northwest Paper Co. v. Federal Power Comm'n, 344 F.2d 47, 51 (8th Cir.1965) (referring to Congress' "intention to centralize the authority over ... [water power] resources in one Government agency."); Scenic Hudson, 370 F.Supp. at 166 (" 'It seems clear that it was the purpose of Congress to bring under this Act all future power development within the jurisdiction of the United States and to concentrate [it] in the hands of the Federal Power Commission [now FERC] ...' ") (quoting 32 Op.Atty.Gen. 525, 528 (1921)). I do not think Congress so intended. I therefore would reverse BPA's interpretation of the statutory term "impose upon."
 
 
 
 [1]
 We note that the case is ripe for review and the parties have standing. The " 'essential facts establishing the right to declaratory relief have already occurred' ": the agency action is final and the issues are legal ones. See Central Montana Elec. Power Coop., Inc. v. Administrator of Bonneville Power Admin., 840 F.2d 1472, 1474 (9th Cir.1988) (quoting Wickland Oil Terminals v. Asarco, Inc., 792 F.2d 887, 893 (9th Cir.1986)); Pence v. Andrus, 586 F.2d 733, 737 (9th Cir.1978). The PUDs allege a real and immediate threatened injury. See Pence, 586 F.2d at 736-38. They experienced economic losses from the 1987 water flow and have reason to expect similar losses in the future. The intervenors also allege sufficient injury. They allege (1) that as significant purchasers of power from the PUDs, their costs are affected by uncompensated PUD losses; and (2) that under certain circumstances they have the right to obtain compensation for monetary costs and power losses under the Act. While we express no opinion as to the intervenors' right to compensation under the Act, for the purpose of standing we accept their uncontested allegations as true and find them sufficient to establish standing. See Portland Gen. Elec. Co. v. Johnson, 754 F.2d 1475, 1480 (9th Cir.1985)
 
 
 [2]
 Sections 803(a) and (b) (1988 & Supp.1990) state:
 (a) Modification of plans; factors considered to secure adaptability of project; recommendations for proposed terms and conditions
 (1) That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial public uses, including irrigation, flood control, water supply, and recreational and other purposes referred to in section 797(e) of this title if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval.
 (2) In order to ensure that the project adopted will be best adapted to the comprehensive plan described in paragraph (1), the Commission shall consider each of the following:
 (A) The extent to which the project is consistent with a comprehensive plan (where one exists) for improving, developing, or conserving a waterway or waterways affected by the project that is prepared by--
 (i) an agency established pursuant to Federal law that has the authority to prepare such a plan; or
 (ii) The State in which the facility is or will be located.
 (B) The recommendations of Federal and State agencies, exercising administration over flood control, navigation, irrigation, recreation, cultural and other relevant resources of the State in which the project is located, and the recommendations (including fish and wildlife recommendations) of Indian tribes affected by the project.
 (C) In the case of a State or municipal applicant, or an applicant which is primarily engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or small power production facilities), the electricity consumption efficiency improvement program of the applicant, including its plans, performance and capabilities for encouraging or assisting its customers to conserve electricity cost-effectively, taking into account the published policies, restrictions, and requirements of relevant State regulatory authorities applicable to such applicant.
 (3) Upon receipt of an application for a license, the Commission shall solicit recommendations from the agencies and Indian tribes identified in subparagraphs (A) and (B) of paragraph (2) for proposed terms and conditions for the Commission's consideration for inclusion in the license.
 (b) Alterations in public works: That except when emergency shall require for the protection of navigation, life, health, or property, no substantial alteration or addition not in conformity with the approved plans shall be made to any dam or other project works constructed hereunder without the prior approval of the Commission; and any emergency alteration or addition so made shall thereafter be subject to such modification and change as the Commission may direct.
 
 
 [3]
 This circuit has recognized the Corps' authority to issue permits for dredge and fill operations. See Friends of the Earth v. U.S. Navy, 841 F.2d 927, 929 (9th Cir.1988) ("the Navy must obtain from the Army Corps of Engineers a '404 permit' before it may discharge dredged or fill material into the navigable waters of the United States")
 
 
 [4]
 In the permit process, the Secretary of the Army acts through the Chief of Engineers of the Corps, who may or may not issue permits after a public hearing. 33 U.S.C. § 1344(a), (d). In conjunction with guidelines developed by the Administrator of the Environmental Protection Agency (EPA), the Secretary of the Army, through the Chief of Engineers of the Corps, specifies the disposal site for such materials if it grants a permit. 33 U.S.C. § 1344(b). The disposal sites are examined specifically for any adverse effects upon fish and wildlife. 33 U.S.C. § 1344(c). The Administrator of the EPA may prohibit the specification of any area as a disposal site if he or she determines that the disposal will have an adverse effect on, among other things, fish and wildlife. 33 U.S.C. § 1344(c). Requirements may be imposed when a discharge permit is granted. 33 U.S.C. § 1344(e)(1)(B)