117 F.3d 1520
 27 Envtl. L. Rep. 21,215, 97 Cal. Daily Op.
Serv. 5234,
97 Daily Journal D.A.R. 8493
 NORTHWEST ENVIRONMENTAL DEFENSE CENTER; Northwest Resource
Information Center, Inc.; Oregon Trout, Inc.;
Idaho Steelhead and Salmon Unlimited;
Salmon For All, Petitioners,
v.
BONNEVILLE POWER ADMINISTRATION; U.S. Department of Energy,
Respondents,
Direct Service Industrial Customers (Aluminum Co. of
America, Atochem North America, Columbia Falls Aluminum
Company, Georgia-Pacific Corp., Kaiser Aluminum & Chemical
Corp., Intalco Aluminum Corp., et al.); Puget Sound Power &
Light Company, a Maine Corporation; City of Seattle, City
Light Department ("City"); Public Utility Dist. No. 2 of
Grant County, Washington ("Grant"); Washington Water Power
Company; Public Utility Dist. No. 1 of Chelan County,
Washington, A Washington municipal corporation ("Chelan");
Public Power Council; Canby Utility Board ("Canby");
Tillamook Peoples' Utility District; Public Utility
District # 1 of Benton County, Washington; Public District
# 1of Franklin County, Washington; Public Utility # 1 of
Skamaia County; Washington and Western Montana Generating &
Transmission Cooperative, Inc.; Portland General Electric
Company; Pacific Power & Light Company; Public Utility
District No. 1 of Douglas County, Respondents-Intervenors.
NORTHWEST ENVIRONMENTAL DEFENSE CENTER; Northwest Resource
Information Center, Inc.; Idaho Steelhead and
Salmon Unlimited; Petitioners,
Public Power Council, Petitioner-Intervenor,
v.
BONNEVILLE POWER ADMINISTRATION; U.S. Department of Energy,
Respondents,
Direct Service Industrial Customers (Aluminum Co. of
America, Atochem North America, Columbia Falls Aluminum
Company, Georgia-Pacific Corp., Kaiser Aluminum & Chemical
Corp., Intalco Aluminum Corp., et al.); Puget Sound Power &
Light Company, a Maine Corporation; City of Seattle, City
Light Department ("City"); Public Utility Dist. No. 2 of
Grant County, Washington ("Grant"); Washington Water Power
Company; Public Utility Dist. No. 1 of Chelan County,
Washington, A Washington municipal corporation ("Chelan");
Public Power Council; Canby Utility Board ("Canby");
Tillamook Peoples' Utility District; Public Utility
District # 1 of Benton County, Washington; Public District
# 1of Franklin County, Washington; Public Utility # 1 of
Skamaia County; Washington and Western Montana Generating &
Transmission Cooperative, Inc.; Portland General Electric
Company; Pacific Power & Light Company; Public Utility
District No. 1 of Douglas County, Respondents-Intervenors.
 Nos. 90-70548, 91-70265.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 4, 1993.
Decided July 1, 1997.
 
 Daniel J. Rohlf, Portland, Oregon, for petitioners.
 Philip S. Key, Bonneville Power Administration, Portland, Oregon, for respondent, Bonneville Power.
 Kristi M. Wallis, Culp, Guterson & Grader, Seattle, Washington, for Public Utility Dist. No. 1, et al.
 Petitions to Review a Decision of the Bonneville Power Administration. BPA No. NWPA.
 Before: REINHARDT, BRUNETTI, and FERNANDEZ, Circuit Judges.
 Opinion by Judge BRUNETTI; Dissent by Judge REINHARDT.
 BRUNETTI, Circuit Judge:
 
 BACKGROUND
 
 1
 Petitioners representing environmental and fishing interests[1] challenge final actions of the Bonneville Power Administration (BPA)[2] in these consolidated petitioners for review. In 1990, BPA entered into agreements with British Columbia Hydro and Power Authority (BC Hydro) and several electric utilities, known as the Mid-Columbia Participants,[3] governing rights to water stored behind hydroelectric dams on the Columbia River system in Canada. Petitioners argue that BPA ignored its statutory duty to provide equitable treatment for fish and wildlife on the river by entering into these agreements. Petitioners also argue that BPA violated the National Environmental Policy Act by failing to prepare an Environmental Impact Statement.
 
 
 2
 There is no single "Law of the River" on the Columbia. Rather, as we consider BPA's decision to enter into these two agreements we must navigate a maze of overlapping treaties, laws, and regulations, which together attempt to balance the varied interests on the river. Prominent among the laws on the river are the United States-Canada Columbia River Treaty, the Northwest Power Act, and the National Environmental Policy Act (NEPA). Subsequent to the submission of this case for decision, the Endangered Species Act (ESA) began playing a significant role. See, e.g., Ramsey v. Kantor, 96 F.3d 434 (9th Cir.1996); Aluminum Co. of America v. National Marine Fisheries Serv., 92 F.3d 902 (9th Cir.1996); Idaho Conservation League v. Thomas, 91 F.3d 1345 (9th Cir.1996); Idaho Dep't Fish & Game v. National Marine Fisheries Serv., 56 F.3d 1071 (9th Cir.1995). It is important to understand both the terms of the agreements, and the law of the river as it existed when BPA entered into them, to properly analyze BPA's decision to enter into the NTSAs.
 
 Columbia River Treaty
 
 3
 The 1964 Columbia River Treaty between the United States and Canada provided for building four storage reservoirs: three in Canada (Mica, Kennleyside, and Duncan) and one in the United States (Libby). The reservoirs that were built and operated under the Treaty represent almost half the water storage on the Columbia River System. The Treaty required 15.5 million acre-feet of Canadian storage, but reservoirs actually built contained storage capacity of 20.5 million acre-feet. The excess storage capacity, most of which is behind Mica Dam, is referred to as non-Treaty storage. The Non-Treaty Storage Agreements, discussed below, were necessary to govern the rights to this additional storage capacity. Nothing in the Treaty prevented Canada from using all of the non-Treaty storage unilaterally, although the United States argued it had the right to compensation if use of the non-Treaty storage resulted in reduced Columbia River flows in the United States.
 
 Northwest Power Act
 
 4
 In 1980, Congress enacted the Northwest Power Act (NPA), 16 U.S.C. §§ 839-839h, which "marked an important shift in federal policy." Northwest Resource Information Center v. Northwest Power Planning, 35 F.3d 1371, 1377 (9th Cir.1994). "Continually declining fish runs had revealed the failures of previous legislative efforts requiring that 'equal consideration' be given to fish and wildlife affected by resource exploitation." Id. The NPA created "a pluralistic intergovernmental and public review process." Id. at 1378. At the hub of this process, Congress established the Pacific Northwest Electric Power and Conservation Planning Council (Council), directing it to create "a program to protect, mitigate, and enhance" the Columbia River Basin's fish and wildlife "to the extent affected by the development and operation of the Basin's hydropower system."[4] 16 U.S.C. § 839b(h)(1)(A), (h)(10)(A). The Council's authority with respect to fish and wildlife measures is constrained; the Council "can guide, but not command, federal river management." 16 U.S.C. §§ 839b(h)(10), 839b(i), 839b(j); see also Northwest Resource Information Center v. National Marine Fisheries Serv., 25 F.3d 872, 874 (9th Cir.1994).
 
 
 5
 Under this statutory scheme, the BPA Administrator has two responsibilities: First, the Northwest Power Act requires the Administrator to exercise his responsibilities under the Act "in a manner that provides equitable treatment" for fish and wildlife. 16 U.S.C. § 839b(h)(11)(A)(i). Second, the Administrator must take into account "to the fullest extent practicable, the program adopted by the Council." 16 U.S.C. § 839b(h)(11)(A)(ii). Attempting to balance environmental and energy considerations, the Act states that fish and wildlife protection measures cannot jeopardize "an adequate, efficient, economical, and reliable power supply." 16 U.S.C. § 839b(h)(5).
 
 
 6
 Since the adoption of the Northwest Power Act, BPA has exercised its responsibility to take into account the Council's Program by adopting many of the Program's essential fish protection measures. First, BPA adopted the centerpiece of the Council's 1987 Program, the "Water Budget," which is a volume of water to be released during the spring in order to "create an artificial freshet that speeds juvenile fish to the ocean." O.R. at 2856. To assist migrating juvenile salmon, the Council established a water budget of 1.19 million acre-feet for the Snake river and 3.45 million acre-feet for the Columbia. Second, BPA agreed to spill water through a spillway, rather than the dam's turbines, which assists juvenile passage through dams. Third, BPA funded fish hatcheries throughout the Columbia River Basin.
 
 
 7
 After the implementation of the Council's 1987 Fish and Wildlife Program, BPA adopted further protective measures for anadromous fish. In 1988, BPA entered in the Vernita Bar Agreement with the Mid-Columbia utility districts to protect chinook spawning, incubation and emergence on Vernita Bar. In 1989, BPA entered into a spill agreement with several fish agencies and the U.S. Army Corps of Engineers.
 
 
 8
 The Council's Program, and BPA's implementation of the Program, failed to reverse the trend of decreasing fish populations on the Columbia. See generally Northwest Resource Information Center, Inc. v. Northwest Power Planning Council, 35 F.3d 1371, 1381-84 (9th Cir.1994). Salmon and steelhead populations continued to decline through 1990. Id. at 1381. In 1990, environmental advocates petitioned the National Marine Fisheries Service to list three Snake River stocks and one Columbia River stock under the Endangered Species Act. Id. In response to the endangered species petitions, various political leaders convened a "Salmon Summit" to develop a comprehensive plan to enhance fish populations on the Columbia. The result of the "Salmon Summit" was the development of the "Strategy for Salmon" which has also been attacked as inadequate. Id. Congress' declared goal "to protect, mitigate and enhance the fish and wildlife" populations on the Columbia River, 16 U.S.C. § 839(6), was still unmet ten years after the passage of the Northwest Power Act.
 
 Non-Treaty Storage Agreements
 
 9
 In the early 1980s, a dispute arose between Canada and the United States regarding the use of non-Treaty storage. BC Hydro asserted its right to use the non-Treaty storage unilaterally, while BPA contended that it was entitled to compensation for any reduction in flows that would result if BC Hydro filled the non-Treaty storage. The parties negotiated a compromise by entering into a Non-Treaty Storage Agreement in 1983. This original fourteen-month agreement was superseded in 1984 with a ten-year agreement in which BPA and BC Hydro agreed to share equally in 2 million acre-feet of water in non-Treaty storage space.
 
 
 10
 In 1987, BPA and BC Hydro agreed to study methods of increasing the efficient operation of the Columbia River hydrosystem without constructing new facilities. The result of these negotiations was the 1990 Non-Treaty Storage Agreement (NTSA or BC Hydro NTSA), which is the subject of this litigation. The NTSA expanded the amount of non-Treaty storage capacity from 2 million acre-feet to about 4.5 million acre-feet, and extended the agreement from 1993--when the old agreement expired--to the year 2003.
 
 
 11
 The BPA Administrator signed the agreement after a two-year public process involving written comments and public meetings. During the process, BPA circulated a draft Environmental Assessment (EA). It issued a final EA after receiving comments on the draft. The U.S. Department of Energy issued a Finding of No Significant Impact (FONSI) on June 25, 1990, and the Administrator issued his NTSA Decision Record and signed the NTSA on July 9, 1990. BPA explains that it entered the NTSA with BC Hydro in part because the Council encouraged it to take actions to offset the loss of power and annual revenue caused by compliance with the Water Budget. It asserts that "the NTSA does not compel any particular allocation" of non-Treaty storage. Official Record ("O.R.") at 1337.
 
 
 12
 During the public comment process leading up to the NTSA, BPA held a series of public meetings with federal and state fish and wildlife agencies, Indian Tribes, utilities, and the public to exchange information and discuss the proposed NTSA. O.R. at 1324-25. Various fishery advocates comprising the Columbia Basin Fish and Wildlife Authority (CBFWA) focused their comments regarding the NTSA on two issues: (1) a concern that the NTSA would negatively impact fisheries interests; and (2) a request that the non-Treaty storage be dedicated to increase flows for anadromous fish. Id.
 
 
 13
 In response to CBFWA's first concern, BPA entered into a separate non-Treaty storage agreement (NTS Fish and Wildlife Agreement). O.R. at 1485-90. This agreement ensures that non-Treaty storage will not be operated in a manner which harms fish and wildlife. O.R. at 1338, 1485-1505. Second, the agreement guarantees that non-Treaty storage will not disrupt existing fish protection measures, such as the Vernita Bar Agreement and the Water Budget. O.R. at 1490. Third, BPA agreed to fund a study regarding the rental of irrigation water in Idaho to augment Snake River flows, and to provide further funds for renting the water, if feasible. O.R. at 1491-92.
 
 
 14
 Finally, BPA entered into a third agreement, which petitioners challenge along with the BC Hydro NTSA. Approximately six months after entering into the NTSA, BPA entered into a power agreement with several utility districts known as the Mid-Columbia Participants. Through this agreement (MCP NTSA), BPA contracted to use some of its share of the non-Treaty storage capacity. The MCP NTSA was made subject to the NTS Fish and Wildlife Agreement. The Mid-Columbia Participants could not, therefore, use their share of the non-Treaty storage water in a manner that would cause adverse effects on the fish to be "greater than would have occurred in the absence of non-Treaty storage." O.R. at 1337, 1489.
 
 DISCUSSION
 
 15
 Petitioners argue that BPA violated the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act or NPA), and the National Environmental Policy Act (NEPA) by entering into the BC Hydro NTSA and the MCP NTSA.[5] For relief, petitioners ask this court (1) to invalidate both the BC Hydro NTSA and the MCP NTSA, and (2) to enjoin BPA from implementing the NTSA agreements until an EIS is prepared. We exercise original jurisdiction over this action pursuant to 16 U.S.C. § 839f(e). Northwest Resource Information Center v. National Marine Fisheries Serv., 25 F.3d 872 (9th Cir.1994).
 
 I.
 SUPPLEMENTAL AFFIDAVITS
 
 16
 Before addressing petitioners' claims that BPA violated the NPA and NEPA, we must first address whether we may consider affidavits submitted by petitioners on appeal. Petitioners have submitted four affidavits in an attempt to establish standing before this court. BPA and the Mid-Columbia Participants moved to strike the affidavits on the grounds that petitioners inappropriately attempted to supplement the administrative record and expand the scope of this litigation. Alternatively, they asked that we allow them to file a supplemental response. Petitioners replied that they submitted the affidavits for the sole purpose of establishing standing. We deny respondents' motion to strike and the alternative motion for leave to file a supplemental response.
 
 
 17
 BPA cited several cases for the proposition that parties appealing agency decisions cannot supplement the record on appeal. These cases are inapposite because they address the merits of the agency decision rather than standing to challenge that decision in a federal court. See, e.g., Seattle Community Council Fed'n v. FAA, 961 F.2d 829, 834 n. 3 (9th Cir.1992). Because Article III's standing requirement does not apply to agency proceedings, petitioners had no reason to include facts sufficient to establish standing as a part of the administrative record. We therefore consider the affidavits not in order to supplement the administrative record on the merits, but rather to determine whether petitioners can satisfy a prerequisite to this court's jurisdiction. Didrickson v. United States Dep't of Interior, 982 F.2d 1332, 1340 (9th Cir.1992) (accepting appellant-intervenors' supplemental declarations alleging particularized injury because intervenors were not required to establish standing until they appealed).
 
 
 18
 BPA also argues that the Supreme Court's decision in Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), requires that petitioners establish standing in their opening brief. In Defenders of Wildlife, the Supreme Court discussed the quantum of proof required of plaintiffs at the pleading, summary judgment, and trial phases of litigation in district court. Id. at 561, 112 S.Ct. at 2136-37. This case is quite different than the examples cited by the Supreme Court, because here we have original jurisdiction. As we have previously noted, "[t]he original jurisdiction granted this court by ... 16 U.S.C. § 839f(e)(5), raises procedural problems that will have to be resolved on a case-by-case basis." California Energy Resources Conservation & Dev. Com'n v. Johnson, 807 F.2d 1456, 1465 n. 7 (9th Cir.1986). Determining standing is essentially a legal inquiry but may involve underlying factual findings. American-Arab Anti-Discrimination Comm. v. Thornburgh, 970 F.2d 501, 506 (9th Cir.1991). Because standing was not at issue in earlier proceedings, we hold that petitioners in this case were entitled to establish standing anytime during the briefing phase. We consider the affidavits solely to determine whether petitioners have standing to bring this action.
 
 
 19
 We deny BPA's alternative motion for leave to file a supplemental response because, from the content of the motion and the representations of counsel at oral arguments, it became clear that BPA wishes to respond only to the affiants' criticisms of BPA's implementation of the NTSA's and the Fish and Wildlife Agreement. As BPA points out, however, implementation of the agreements is not before this court. The profferred response is therefore irrelevant.
 
 II.
 NORTHWEST POWER ACT
 
 20
 Petitioners argue that BPA violated the Northwest Power Act by failing to provide equitable treatment for fish and wildlife. They argue that BPA acted inequitably towards the fish in that (1) the NTSAs will cause a reduction in the number of fish on the river; and (2) by entering into the NTSAs, BPA benefitted power interests without guaranteed and concomitant benefits for fish. In addition to their equitable treatment claim, petitioners argue that BPA failed to comply with the Act's procedures for the acquisition of major resources.
 
 A.
 Standing
 
 21
 As a threshold issue, BPA argues that petitioners lack standing to raise their Northwest Power Act claim. To establish standing petitioners "must have suffered an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal citations and quotations omitted). In addition, petitioners must show that such injury is fairly traceable to the challenged action. Id. Finally, they must show that it is likely that the injury will be redressed by a foreseeable decision. Id. The party invoking federal jurisdiction bears the burden of establishing standing. Id. Standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof.
 
 
 22
 The supplemental affidavits submitted by the petitioners are sufficient to establish that any injury to fish and wildlife interests on the Columbia River would cause injury to each petitioner.[6] The more difficult issue for petitioners is demonstrating that the NTSAs will cause injury to the fish. First, petitioners argue that the NTSAs will cause harm to fish by reducing their stocks on the river. They claim that BPA's environmental assessment itself, prepared prior to entering into the NTSAs, identifies negative impacts to salmon as a likely result of BPA's decision to enter into the NTSA and MCP NTSA. The portion of the EA to which petitioners refer, states:
 
 
 23
 Changes to flow and spill resulting from the proposal have little effect on anadromous fish migrating through the Columbia and Snake River systems. The analysis of survival changes under the opportunity storage alternative shows projected average relative changes in survival throughout the contract for all yearling, subyearlings, steelhead, and sockeye ranged respectively, from increases of 1.5, 1.0, 0.7, and 0.4 percent to decreases of 0.2, 0.9, 0.2, and 0.0 percent. These effects were evaluated based on their stock assessment information and were found to be insignificant.
 
 
 24
 O.R. at 1278. Contrary to petitioners' claim, this statement does not show that the harm to the fish is a likely result of the NTSA. Petitioners submit no evidence rebutting BPA's conclusion that the NTSAs' effects on fish populations were insignificant. Petitioners' claim of injury, therefore, is too speculative, falling far short of the Court's requirement that the injury be "certainly impending." See Defenders of Wildlife, 504 U.S. at 564 n. 2, 112 S.Ct. at 2138 n. 2. Here, it is just as likely that BPA's decision to enter into the NTSAs will result in an increase in the fish population as a decrease.
 
 
 25
 Petitioners also argue that BPA's responsibility to provide equitable treatment for fish and wildlife required BPA to dedicate a portion of the non-Treaty storage capacity for the benefit of fish.[7] If the Northwest Power Act guarantees the fish a portion of the non-Treaty storage, it is clear that a denial of this great benefit would injure the fish; consequently, petitioners would be injured and they would have standing to sue. Therefore, we will address the merits of petitioners Northwest Power Act claim to determine whether the Act requires BPA to dedicate a portion of the non-Treaty storage for the benefit of the fish.
 
 B.
 Standard of Review
 
 26
 "[W]e review the construction of a statute de novo as a question of law, [but] we accord substantial deference to the interpretation given statutes by the officers or agency charged with their administration." Central Montana Elec. Power Coop. v. Administrator of Bonneville Power Admin., 840 F.2d 1472, 1476 (9th Cir.1988) (citations omitted). To uphold BPA's interpretation of the Northwest Power Act, we "need only conclude that it is a reasonable interpretation of the relevant provisions." Id. at 1476-77 (quotations and citations omitted).
 
 C.
 Equitable Treatment
 
 27
 Petitioners argue that once BPA gained control over 2.25 million acre-feet of the non-Treaty storage capacity, it was required, under the Northwest Power Act, to dedicate a portion of that water to benefit fish and wildlife interests. According to this argument, the fish are not worse off as a result of the NTSAs. Rather, petitioners argue, if BPA enters into a contract benefitting power, it must contract an equal benefit for fish. Petitioners claim to a dedicated portion of the non-Treaty storage is of great importance. The precipitous decline in salmon population has reached a crisis level. Because the resources of the river have been overtapped, many commentators have noted the need for additional sources of water. The prospect of seizing upon Canadian storage has been seen by some commentators as the solution to the river's problems.
 
 
 28
 We have all spoken about how difficult it is to change the hydrosystem because so little additional water is available to help fish. However, one thing we have not talked about a great deal is the 20.5 million acre-feet of storage in Canada. That is a lot of storage. We have yet to take a comprehensive look at how Canadian storage can help salmon. The Bonneville Power Administration has, to some extent, used its ability to regulate Canadian storage to help fish by inserting water budget requirements into treaty operations. But I think a larger question needs to be asked: What additional benefits can Canadian storage provide to fish in the Columbia Basin? This is an issue for the future.
 
 
 29
 Daniel Rohlf, "Colloquim: Who Runs the River?" 25 Envtl L. 413, 415 (1995).
 
 
 30
 Petitioners have seized upon the Northwest Power Act as the means to obtain a share of the Canadian storage for fish and wildlife. The basis for petitioners' claim to a portion of the non-Treaty storage capacity is BPA's obligation to provide equitable treatment for fish and wildlife interests. The Northwest Power Act directs the Council to "promptly develop and adopt ... a program to protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, on the Columbia River and its tributaries." 16 U.S.C. § 839b(h)(1)(A). The centerpiece of the program adopted by the Council is the Water Budget, a volume of water released in the spring to assist juvenile anadromous fish in their migration. The Northwest Power Act requires BPA to "exercise [its] responsibilities taking into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the Council." 16 U.S.C. § 839b(h)(11)(A)(ii). In addition, the Act imposes upon BPA an independent duty toexercise its responsibilities consistent with the purposes of this chapter and other applicable laws, to adequately protect, mitigate, and enhance fish and wildlife, including related spawning grounds an habitat, affected by such projects or facilities in a manner that provides equitable treatment for such fish and wildlife with the other purposes for which such system and facilities are managed and operated.
 
 
 31
 16 U.S.C. § 839b(h)(11)(A)(ii). These two paragraphs in Section 839b(h)(11)(A) define distinct duties. First, under paragraph (ii), BPA must take the Council's Fish and Wildlife Program into account to the fullest extent possible. See Northwest Resource Information Center, Inc. v. Northwest Power Planning Council, 35 F.3d 1371 (9th Cir.1994) (NRIC ). Second, under paragraph (i), BPA has an independent, substantive obligation to insure equitable treatment. See Public Utility Dist. No. 1 of Douglas County v. Bonneville Power Admin., 947 F.2d 386, 392-94 (9th Cir.1991); Confederated Tribes and Bands of the Yakima Indian Nation v. Federal Energy Regulatory Com'n, 746 F.2d 466, 473 (9th Cir.1984).
 
 
 32
 This statutory regime requires two levels of consideration for fish and wildlife. The primary fish and wildlife protection measures are intended to be established through the Council's Program. The statutory structure of the Northwest Power Act makes it clear that the Program was to be developed through a detailed and deliberate process of consultation with fishery managers who have great experience and expertise with fish and wildlife protection. See NRIC, 35 F.3d at 1388. Section (a)(1) of the Act establishes the Council and directs it to adopt a "program to protect, mitigate, and enhance fish and wildlife, and to otherwise expeditiously and effectively carry out the Council's responsibilities and functions under this chapter." 16 U.S.C. § 839b(a)(1)(B). In developing its Program, the Council is required to request recommendations from the "Federal, and the region's State, fish and wildlife agencies and from the region's appropriate Indian tribes." 16 U.S.C. § 839b(h)(2). The Council is not permitted to simply disregard this advice from fishery managers. Rather, "[t]he Council shall develop a program on the basis of such recommendations." 16 U.S.C. § 839b(h)(5). Finally,
 
 
 33
 [t]he Council shall determine whether each recommendation received is consistent with the purposes of this chapter. In the event such recommendations are inconsistent with each other, the Council, in consultation with appropriate entities, shall resolve such inconsistency in the program giving due weight to the recommendations, expertise, and legal rights and responsibilities of the Federal and the region's State fish and wildlife agencies and appropriate Indian tribes. If the Council does not adopt any recommendation of the fish and wildlife agencies and Indian tribes as a part of the program or any other recommendation, it shall explain in writing as part of the program, the basis for its finding.
 
 
 34
 16 U.S.C. § 839b(h)(7).
 
 
 35
 In NRIC, "the Council rejected the consensus of agencies and tribes that flows should be significantly increased, and adopted flows very close to those recommended by power interests." NRIC, 35 F.3d at 1382. NRIC and the Yakima Nation argued that the Council failed to explain, in the Program, a statutory basis for its rejection of river flow recommendations of fishery managers. Id. at 1384. We held that the mandatory language in the Northwest Power Act required the Council to state, in its final decision, why it rejected the recommendations of the fishery managers. Id. at 1385.
 
 
 36
 Further, we rejected the Council's argument that the Act's requirement that it give "due deference" to the fishery managers requires only nominal deference. We explained that "Congress realized that furtherance of the purpose of the Act, that fish and wildlife be on a par with energy, required that the Council defer to the recommendations of agencies and tribes." Id. at 1388. We noted that the reason for the high degree of deference to the fishery managers was their "unique experience and expertise in fish and wildlife." Id.
 
 
 37
 The Northwest Power Act thus requires the Council to adopt a fish and wildlife program that includes the recommendations of the fishery managers with their great expertise in fish and wildlife regulation. Although the Council's Program is not binding on BPA, BPA is required to take into account the Council's Program to the fullest extent possible. In this case, petitioners do not argue that BPA has failed to take the Council's Program into account. Indeed, BPA has adopted the central provisions of the Council's fish and wildlife program, including the Water Budget.
 
 
 38
 However, as we have stated before, BPA's responsibilities to protect fish and wildlife do not end with even complete adoption of the Council's Program. In Confederated Tribes, 746 F.2d at 473, we held that BPA's equitable treatment obligation is "substantive," and in Public Utility Dist. No. 1 of Douglas County, 947 F.2d at 392, we held that the obligation is "independent" of BPA's responsibility to take into account the Council's Program. However, we have not yet determined the extent of BPA's responsibilities to provide equitable treatment. We now turn to the question whether this provision of the Northwest Power Act requires BPA to dedicate a portion of the non-Treaty storage capacity to benefit fish.
 
 
 39
 In Confederated Tribes, we granted a petition for review and directed the Federal Energy Regulatory Commission (FERC) to consider fishery issues prior to granting a forty-year renewal of a power license to the Chelan public utility district. FERC had begun hearings to develop fish and wildlife protection measures on the Mid-Columbia, but before these proceedings were concluded, FERC granted the license renewal. FERC argued that it was not required to consider fish and wildlife prior to granting the renewal because the license contained a provision that would allow it to impose fish and wildlife protection measures once the Mid-Columbia proceedings were complete. We rejected FERC's contentions, largely on the basis that FERC violated the Federal Power Act.
 
 
 40
 However, because the issue had been raised by the petitioners, we also considered FERC's obligation under the Northwest Power Act. Id. at 473. We noted that "[o]ne purpose of the [Northwest Power Act] is to place fish and wildlife concerns on equal footing with power production." Id. We then held that FERC failed to meet its obligation to give fish "equitable treatment" under the Northwest Power Act. Id. Although Confederated Tribes provides a useful first examination of BPA's paragraph (i) responsibilities, it does not help resolve the more difficult questions presented in this case. In Confederated Tribes, FERC completely failed to consider the license renewal's potential impact on fish and wildlife. In this case, BPA had the benefit of the Council's Program, which it then implemented.
 
 
 41
 In Public Utility Dist. No. 1 of Douglas County, we explained one additional element of BPA's responsibilities under paragraph (i). We explained for the first time that a federal agency could not satisfy its equitable treatment responsibilities under paragraph (i) simply by adopting the Council's program under paragraph (ii). 947 F.2d at 392. We recognized that if the Council's Program fails to ensure adequate fish survival, BPA would be required to take additional measures under paragraph (ii). Id.
 
 
 42
 Public Utility Dist. No. 1 of Douglas County, like Confederated Tribes, falls short of providing clear guidance in this case. The court in Public Utility Dist. No. 1 of Douglas County was not presented with a situation, as we are here, where the Council's Program is alleged to be inadequate. The court was simply interpreting the second sentence of 16 U.S.C. § 839b(h)(11)(A)(ii), which requires BPA to compensate private losses resulting from its imposition of fish protection "measures." 947 F.2d at 391. The court rejected BPA's construction that the Act should be read to distinguish between Program measures and non-Program measures. Id. at 392. The court held that BPA may undertake protection measures under the Program, or in addition to the Program if the Program is insufficient. Id. In either case, we held, BPA was required to compensate for losses.
 
 
 43
 Echoing the court's admonition in Public Utility Dist. No. 1 of Douglas County, petitioners argue that the Council's Program was insufficient at the time BPA entered into the NTSAs. Indeed, petitioners argue that the Council itself recognized the inadequacy of its Program. The Council recognized improvements in main stem flows for fish as "crucial," O.R. at 2843, and recommended that hydrosystem managers examine the "[f]easibility of using uncontracted water stored in existing reservoirs." O.R. at 2896. Accordingly, petitioners argue that BPA was required to take additional measures to insure the survival of fish and wildlife. Specifically, petitioners suggest that since BPA gained control over a considerable amount of water through the BC Hydro NTSA, BPA should have dedicated a portion of that water to benefit fish.
 
 
 44
 We reject petitioners' suggestions that BPA was required, at the time it entered into the NTSAs, to dedicate a portion of the water for fish. We are aware of no requirement that an allocation among uses be made at the time of BPA's entering into the agreements. Although the MCP NTSA provides that some of its non-Treaty storage capacity will be used for power purposes, the vast majority of BPA's share of the non-Treaty storage capacity is unallocated, and BPA may well decide that its responsibilities to provide equitable treatment require it to use a reasonable portion of this water for the benefit of fish. We are left to speculate about how much water BPA will dedicate for fish and wildlife. It may be that BPA would violate its paragraph (i) obligations by using a disproportionate amount of its non-Treaty storage capacity for power purposes. At this point, however, it is premature for petitioners to argue that BPA has violated its paragraph (i) obligations. While BPA could have attempted to negotiate agreements that would have required BC Hydro and the Mid-Columbia Participants to use a portion of their share of non-Treaty storage to benefit salmon, BPA may also benefit salmon by dedicating its own share for that purpose. The court's role is not to dictate in advance how BPA is to exercise its obligations under the Northwest Power Act. Our role is to review BPA's actions, once made, to determine whether it has provided equitable treatment. The mere fact that it has allocated a comparatively small portion of the supplemental reserve is not enough to invoke that authority.
 
 
 45
 Furthermore, in the Administrator's Decision Record on the NTSA, BPA took the position that the equitable treatment provision describes a balancing test:
 
 
 46
 BPA believes that equitable treatment for fish and wildlife requires a systemmatic [sic] and comprehensive approach to fish and wildlife protection and enhancement in the region. BPA provides equitable treatment in a system-wide manner through the Council's Fish and Wildlife Program and through BPA's implementation of that program and other fish and wildlife measures BPA elects to undertake.
 
 
 47
 BPA does not agree that every discrete power marketing action requires equal payment or compensation for fish and wildlife.
 
 
 48
 O.R. at 1331. BPA's view that it must balance power needs and wildlife needs on a system-wide basis is a reasonable reading of the Northwest Power Act. Section 839b(h)(11)(A) does not explicitly require that each action individually provide equitable treatment. Moreover, in its directive to the Council, Congress recognized the need for a comprehensive approach to fish and wildlife protection on the Columbia:
 
 
 49
 The Council shall promptly develop and adopt, pursuant to this subsection, a program to protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, on the Columbia River and its tributaries. Because of the unique history, problems, and opportunities presented by the development and operation of hydroelectric facilities on the Columbia River and its tributaries, the program, to the greatest extent possible, shall be designed to deal with that river and its tributaries as a system.
 
 
 50
 16 U.S.C. § 839b(h)(1)(A). Congress thus recognized that each human use of the Columbia Basin is interrelated to the health of the entire ecosystem. Cf. Alaska Ctr. for the Environment v. Browner, 20 F.3d 981, 985 (9th Cir.1994) (finding that Congress considered all waters within a state interrelated for Clean Water Act purposes). While each power marketing action that affects the system implicates the equitable treatment provision, BPA may properly exercise its obligation by insuring equitable treatment for fish on a system-wide basis.
 
 
 51
 We emphasize that "equitable treatment" is a highly fact-specific determination. We find it important in this case that: (1) BPA's environmental assessment shows, and petitioners do not present evidence to the contrary, that the NTSAs will not significantly impact the fish population of the river; (2) BPA signed the NTS Fish and Wildlife Agreement, making guarantees that BC Hydro's and the Mid-Columbia Participants' use of non-Treaty storage would not have a deleterious effect on fish and wildlife; and (3) BPA has left unallocated most of its 2.25 million acre-feet share of the 4.5 million acre-feet of non-Treaty storage. Under these circumstances, and in light of BPA's system-wide approach to its equitable treatment responsibilities, we think it is premature to determine whether BPA has satisfied its obligations. We make this determination only on the record before us, and only to determine that BPA did not violate the Northwest Power Act by entering into the NTSAs.
 
 
 52
 Although we hold that BPA need not undertake an equitable treatment analysis for every discrete power marketing decision, BPA should nonetheless develop a mechanism for fulfilling its obligation under paragraph (i). Without any guidance from BPA, it is difficult for a reviewing court to determine whether BPA has properly exercised its equitable treatment responsibilities. In this case, we find it is premature to consider petitioners' claims. Once BPA allocates the non-Treaty storage, however, BPA will be required to demonstrate, by means that allow for meaningful review, that it has treated fish and wildlife equitably.
 
 D.
 Resource Acquisition
 
 53
 Petitioners also argue that the NTSA violates the Northwest Power Act because BPA failed to comply with the Act's procedures for the acquisition of major resources detailed in section 6(c), 16 U.S.C. § 839d(c), which include the requirement that BPA submit the NTSA to the Council for a review of its consistency with the Council's Power Plan. BPA contends that (1) petitioners are precluded from asserting this claim because they did not raise it during the public process; and (2) the NTSA was not a resource acquisition.
 
 1.
 Vermont Yankee
 Doctrine
 
 54
 BPA cites Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553, 98 S.Ct. 1197, 1216-17, 55 L.Ed.2d 460 (1978), and Havasupai Tribe v. Robertson, 943 F.2d 32, 34 (9th Cir.1991), for the proposition that petitioners cannot challenge the NTSA on the basis that section 6(c) because they never raised the issue during the public process.[8] In Vermont Yankee, the Court stated that those who wish to have input into the NEPA process have an obligation to structure their participation so that it alerts the agency to their contentions. 435 U.S. at 553, 98 S.Ct. at 1216-17. In Havasupai Tribe, the court expressed concern that the Tribe did not raise its claim of inadequate consideration of groundwater impacts until after the final EIS was issued. Nevertheless, it reached the Tribe's claim. 943 F.2d at 34.
 
 
 55
 We have held that the language in Vermont Yankee does not "establish a broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision." Kunaknana v. Clark, 742 F.2d 1145, 1148 (9th Cir.1984). The Kunaknana court stated:The rationale of Vermont Yankee has been applied in those instances in which an interested party suggests that certain factors be included in the agency analysis but later refuses the agency's request for assistance in exploring that party's contentions. Such a party will not be permitted to challenge the agency decision on the ground that it failed to consider the necessary alternatives.
 
 
 56
 Id. (citations omitted).
 
 
 57
 Vermont Yankee and Havasupai Tribe involved the failure to raise a specific factual contention regarding the substantive content of an EIS during the NEPA public comment process. See also Citizens for Clean Air v. EPA, 959 F.2d 839, 846-47 (9th Cir.1992). In contrast, petitioners in the present case contest an alleged procedural violation of a statute that governs the public comment process. While it would have been preferable to raise the issue earlier, BPA has a duty to comply with public participation processes provided for in the Northwest Power Act regardless of whether participants complain of violations. We therefore reach the merits of petitioners' section 6(c) claims.
 
 2.
 
 58
 The NTSA Is Not a Major Resource Acquisition
 
 
 59
 The Northwest Power Act defines major resource as "any resource that (A) has a planned capability greater than fifty average megawatts, and (B) if acquired by the Administrator, is acquired for a period of more than five years." 16 U.S.C. § 839a(12). In its policy addressing "the types of resource acquisition proposals subject to section 6(c) review," BPA concluded that "[i]nterregional exchanges are not subject to section 6(c) review." 51 Fed.Reg. 42902, 42904 (1986).
 
 
 60
 Petitioners acknowledge that the NTSA is an interregional exchange, Petitioners' Brief at 23, yet argue that the clear language of the Act compels finding that such an exchange constitutes a major resource acquisition. Petitioners' Reply Brief at 23. They reason that since section 839d(1) mentions "mutually beneficial interregional exchanges of electric power,"[9] and since section 6(c) review procedures apply to proposals to acquire a major resource under section 839d(1),[10] then a mutually beneficial exchange must constitute a major resource acquisition if it has a planned capability greater than fifty average megawatts and is acquired by the Administrator for more than five years. Id. The problem with this argument is that section 839d(1) does not explicitly define an interregional exchange as a resource acquisition. Rather, it merely authorizes the Administrator to investigate such exchanges. 16 U.S.C. § 839d(1)(2).
 
 
 61
 BPA followed proper procedures for construing the statute: (1) the language of the statute is ambiguous, (2) the Policy was adopted pursuant to applicable notice and comment procedures; and (3) petitioners did not challenge the policy within the ninety-day limitations period provided for in 16 U.S.C. § 839f(e). Because BPA neither violated any procedural requirements nor construed the statute unreasonably in concluding that the NTSA was not a major resource acquisition, we reject petitioner's final contention under the NPA.
 
 III.
 NEPA
 
 62
 NEPA requires federal agencies to prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "An agency must prepare an EIS if 'substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor.' " Greenpeace Action v. Franklin, 14 F.3d 1324, 1332 (9th Cir.1992) (quoting LaFlamme v. FERC, 852 F.2d 389, 397 (9th Cir.1988)). NEPA's goals are "(1) to ensure the agency will have detailed information on significant environmental impacts when it makes its decisions; and (2) to guarantee that this information will be available to a larger audience." Inland Empire Public Lands v. United States Forest Service, 88 F.3d 754, 758 (9th Cir.1996). NEPA exists to ensure a process, not a result. Id.
 
 
 63
 We review BPA's decision not to prepare an EIS under an "arbitrary and capricious" standard of review. Greenpeace Action v. Franklin, 14 F.3d 1324 (9th Cir.1993). Using this standard, we consider only whether BPA's decision to enter into the NTSAs is based on a "reasoned evaluation of the relevant factors." Id. at 1332. We will overturn BPA's decision only if BPA committed a "clear error in judgment." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378, 385, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989).
 
 A.
 Public Controversy
 
 64
 Petitioners argue that BPA should have prepared an EIS because the decision to enter into the NTSA was extremely controversial. "The existence of a public controversy over the effect of an agency action is one factor in determining whether the agency should prepare [an EIS]." Greenpeace Action, 14 F.3d at 1333, 40 C.F.R. § 1508.27(b)(4) (1993). A federal action is controversial if "a substantial dispute exists as to [its] size, nature, or effect." LaFlamme, 852 F.2d at 400-01 (internal quotations and citations omitted). Controversy does not refer to the existence of opposition to a use. Id. at 401. While some comments on the preliminary EA expressed concern regarding the NTSAs' effect on anadromous fish, others suggested as an alternative use that BPA set aside some of the additional storage capacity to benefit fish. BPA addressed the potential effects of the NTSAs on fish in the Fish and Wildlife Agreement, apparently to the satisfaction of some commentators who had expressed concern regarding adverse effects on anadromous fish. The chairman of the Columbia Basin Fish and Wildlife Authority (CBFWA) stated:
 
 
 65
 Since submitting [our] comments [regarding adverse effects of the NTSA on fish], BPA and CBFWA have worked cooperatively to find a way to alleviate CBFWA concerns and make the implementation of the NTSA work for both fish and wildlife and power communities. This letter signals our belief that we have reached an agreement that addresses our concerns.
 
 
 66
 BPA's conclusion that the NTS Fish and Wildlife Agreement alleviated most of the concerns regarding the effect of entering into the NTSA was not arbitrary or capricious. See O.R. at 1504.
 
 B.
 Cumulative Impacts
 
 67
 Petitioners also claim that an EIS is required because the EA does not provide an adequate analysis of cumulative impacts resulting from the NTSA, BPA's 1988 decision to increase the Intertie capacity,[11] and the proposed expansion of the Bureau of Reclamation's Columbia Basin Project.
 
 
 68
 Cumulative impact is the impact on the environment which
 
 
 69
 results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.
 
 
 70
 40 C.F.R. § 1508.7.
 
 
 71
 BPA evaluated the cumulative impacts of the NTSA and the Intertie expansion by using computer modeling to update the information in the Intertie EIS with the potential additional impact of the NTSA. When BPA prepared the EA, it made certain assumptions regarding when fish bypasses[12] would be installed at some of the dams. Petitioners charge that BPA ignored information about delays in bypass construction when it determined that the combined effects of the Intertie expansion and the NTSA would not significantly affect salmon. BPA replies that the FISHPASS modeling program used in the study is not sensitive to installation dates because it uses a comparative analysis based on assumptions that are consistent throughout all studies.
 
 
 72
 Petitioners may be correct in pointing out that bypass delays could dramatically affect fish survival rates, but BPA is limited in its ability to study the impact of the NTSA by the technology available to it. Petitioners do not suggest how BPA could have adjusted its analyses to account for the discrepancy in installation dates.[13] "NEPA does not require that we decide whether an [environmental assessment] is based on the best scientific methodology available." Greenpeace Action, 14 F.3d at 1333. See also Idaho Conservation League, 956 F.2d at 1522.
 
 
 73
 Petitioners criticize BPA's method of evaluating the cumulative impacts of the NTSA and the Intertie expansion on individual salmon stocks. BPA performed separate computer analyses to study the impact on salmon of the NTSA alone and of the NTSA together with the Intertie expansion. In one computer model, it simulated hydrosystem operations pursuant to the NTSA. In a second model, it simulated hydrosystem changes resulting from the NTSA and the Intertie expansion. BPA compared these results to a base case. It then performed detailed assessments on certain stocks for which the FISHPASS model showed specified survival decreases. The purpose of the individual assessments was to determine whether the NTSA-either alone or in conjunction with the Intertie expansion-would significantly affect the survival of salmon stocks that met BPA's flagging criteria.
 
 
 74
 Petitioners claim that although BPA individually assessed all stocks that met the flagging criteria under the NTSA model, it did not assess the additional stocks that met the flagging criteria under the cumulative impact model. BPA responds that it did not perform assessments on some of the stocks that showed a potential cumulative impact from the Intertie alone because assessments on those stocks were already included in the Intertie EIS, which BPA considered in the EA. BPA may reasonably incorporate information from an impact analysis for a prior action to evaluate cumulative effects when those effects result exclusively from the prior action. See California Trout v. Schaefer, 58 F.3d 469, 474 (9th Cir.1995) ("[r]equiring the Corps to duplicate these efforts would be nonsensical").
 
 
 75
 Petitioners also argue that BPA should have considered the cumulative impacts of a proposed expansion of the Bureau of Reclamation's Columbia Basin Project, which would divert more water from the Columbia River for irrigation. With this argument petitioners repeat the same error that guided their equitable treatment argument. Petitioners here focus on how the non-Treaty storage will be allocated. Petitioners worry that if more water is diverted for irrigation, less water will be left for fish and wildlife. As we discussed in Section II, it is premature for petitioners to challenge how the water will be used. In this case, we review only BPA's decision to enter into the NTSAs.
 
 
 76
 The use of the non-Treaty storage will be studied in the Columbia River Hydroelectric Operations System Operation Review (SOR), which was scheduled to be completed in 1994. At the time BPA entered into the NTSAs, BPA and the CBFWA recognized that the use of the non-Treaty storage would be considered in the SOR:
 
 5. Systems Operation Review Process
 
 77
 All parties agree that the development of a systems plan for the Columbia Basin, which focuses on all competing interests within that system, makes a great deal of sense. The interaction between BPA, the Corps, the Bureau, the Tribes and fish and wildlife agencies is complex, and has not been discussed in detail among the parties. BPA and the fish and wildlife agencies and Tribes agree to use their best efforts to establish ground rules for an effective working relationship between all such parties by no later than September 30, 1990. This process will include a description of the roles of the parties at both policy and technical levels.
 
 
 78
 "Non-Treaty Storage Fish and Wildlife Agreement," (1990) O.R. at 1498. Furthermore, the proposed expansion of the Columbia Basin Project will not escape NEPA review. See California Trout, 58 F.3d at 474. Indeed, as petitioners recognize, a draft EIS on the Columbia Basin Project was completed in 1989, a year before BPA entered into the NTSAs. Accordingly, we hold that BPA made a "reasoned evaluation of the relevant factors" without considering the proposed expansion of the Columbia River Basin. Greenpeace Action, 14 F.3d at 1332.
 
 C.
 Consideration of Alternatives
 
 79
 NEPA requires that a federal agency "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). See also 40 C.F.R. § 1508.9(b). "[A]n agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action." Idaho Conservation League, 956 F.2d at 1520 (internal quotation and citation omitted). "We review an agency's range of alternatives under a 'rule of reason' standard that 'requires an agency to set forth only those alternatives necessary to permit a reasoned choice.' " Headwaters, Inc. v. Bureau of Land Management, 914 F.2d 1174, 1180 (9th Cir.1990) (quoting California v. Block, 690 F.2d 753, 767 (9th Cir.1982)).
 
 
 80
 Petitioners contend that BPA failed to explore an adequate range of alternatives because it considered only signing the NTSA or doing nothing. They argue that BPA ignored comments that suggested it consider possible uses of non-Treaty storage that would benefit fish, preferring instead to define the objective of its action so specifically as to narrow the reasonable alternatives to its proposed action and no action. We disagree that BPA was required to consider use of non-Treaty storage for fish. The NTSA governs BPA's rights to storage capacity in Canadian reservoirs, it does not govern the allocation of water stored in those reservoirs. Furthermore, as discussed above, the SOR will address the use of non-Treaty storage capacity, including its use to benefit fish and wildlife. BPA and the CBFWA agreed in the NTS Fish and Wildlife Agreement that the "NTSA will be discussed in the context of the SOR, and that revisions to this Agreement may be necessary and appropriate to implement plans approved appropriate to SOR." O.R. at 1498. BPA was not required to consider using non-Treaty storage for fish and wildlife at the time it entered into the NTSAs.
 
 D.
 Fish and Wildlife Agreement
 
 81
 Petitioners contend that the Administrator was not justified in relying on the NTS Fish and Wildlife Agreement in deciding to proceed with the NTSA, because the EA does not address this agreement and the public did not have the opportunity to review it during the NTSA public comment process. BPA responds that the agreement was within the range of alternatives the public could have reasonably anticipated. It relies on this court's statement that "agencies must have some flexibility to modify alternatives canvassed in the draft EIS to reflect public input without having to circulate a supplemental draft EIS describing the proposed action." Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 508-09 (9th Cir.1988) (quotation omitted).
 
 
 82
 We agree with BPA that it was not necessary to include an analysis of the Fish and Wildlife Agreement in the EA or to allow public comment on the Agreement. Without reference to the Fish and Wildlife Agreement, the Department of Energy concluded in the FONSI that the NTSA would not result in significant environmental impacts. In deciding to enter into the NTSA, the Administrator relied primarily on the analysis in the EA and the FONSI that the NTSA would have little, if any, effect on anadromous fish resources. The Administrator viewed the NTS Fish and Wildlife Agreement as a means of alleviating the concerns of the fisheries community rather than as a means of mitigating environmental impacts. As such, it was a logical outgrowth of the public comment process that the public could have reasonably anticipated. Moreover, many organizations concerned with anadromous fish survival participated in negotiating the Agreement, thereby providing significant public input.
 
 CONCLUSION
 
 83
 We deny respondents' motion to strike petitioners' supplemental affidavits and the alternative motion for leave to file a supplemental response. We hold that BPA did not violate the Northwest Power Act or NEPA when it entered into the NTSA. Consequently, we will not enjoin BPA from operating the hydrosystem under the NTSA, nor will we remand to BPA for preparation of an EIS.
 
 
 84
 PETITION FOR REVIEW DENIED.
 
 
 85
 REINHARDT, Circuit Judge, concurring in part and dissenting in part:
 
 
 86
 I concur in Parts I and II of the majority opinion. I agree that the actions taken by BPA as of the time of the filing of the complaint did not constitute a violation of the agency's equitable treatment obligation under the Northwest Power Act. I do not agree, however, that BPA satisfied the procedural requirements of the National Environmental Policy Act.
 
 
 87
 1. An Environmental Impact Statement Was Necessary.--The National Environmental Policy Act, or NEPA, "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(c). NEPA contains " 'action-forcing' provisions to make sure that federal agencies act according to the letter and spirit of the Act." Id. Among these provisions is the requirement that agencies must prepare environmental impact statements whenever "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor." LaFlamme v. FERC, 852 F.2d 389, 397 (9th Cir.1988) (quoting City & County of San Francisco v. United States, 615 F.2d 498, 500 (9th Cir.1980)) (emphasis in original) (internal quotation marks omitted). This requirement is an easily triggered and thoroughly benign one that does not force an agency to make a particular decision, but is intended merely to enhance the quality of agency decisionmaking and to inform the public. See 40 C.F.R. § 1500.1(c) (explaining that the purpose of the NEPA process is "not to generate paperwork," but "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment"); id. § 1500.2 (directing federal agencies to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment.").
 
 
 88
 In this case, the sheer scale of the NTSA and the precipitous decline of salmon populations in the Columbia River system call for the careful agency analysis and reflection inherent in the preparation of a full-scale EIS. The NTSA is no small undertaking: it gives BPA shared control over up to five million acre-feet of water storage, which is roughly equal to the amount of water stored behind Grand Coulee Dam. Moreover, the ultimate effect on the environment may be enormous. To hold BPA to its obligation to prepare an EIS is not to say that BPA may not acquire extra storage capacity, or that it should have entered into a different type of agreement. Rather, before entering into any agreement, BPA was obligated to weigh carefully its full range of options. It was required to assess openly, with the opportunity for public participation, the potential uses and effects of so much added capacity, particularly in light of the fact that hundreds of identifiable salmon populations in the Columbia Basin have already become extinct, while others are presently threatened or endangered. It was under a duty to examine carefully whether the contemplated agreement constituted the best procedure, given the significant environmental implications, or whether there were other approaches that might have better achieved its ultimate objective and more effectively advanced the public interest. The EIS requirement is intended to force precisely such deliberation on the part of federal agencies. BPA had every reason to prepare an EIS in this case, and no reason not to do so.
 
 
 89
 The majority concludes that an EIS was unnecessary by focusing not on the magnitude of the NTSA, on the grave situation of salmon populations in the Columbia River system, or even on the ultimate events that will necessarily transpire as a result of its action, but only on the immediate or short-range consequences. The majority also isolates a variety of individual factors, none of which it finds requires an EIS, and examines them singly rather than cumulatively. The environmental significance of a proposed action such as the NTSA, however, "cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7). Even if, as the majority suggests, BPA has ameliorated the effect of a particular factor to the point where, viewed by itself, that factor would not require the preparation of an EIS, the EIS requirement is still triggered if all factors, considered together, create a question as to whether the action may significantly degrade the environment. Cf. Greenpeace Action v. Franklin, 14 F.3d 1324, 1333 (9th Cir.1992) (noting that the existence of a public controversy is merely "one factor in determining whether the agency should prepare such a statement," not a litmus test unto itself). In this case, I believe that each of the factors rejected by the majority weighs in favor of preparation of an EIS, and that collectively they unquestionably require such action.
 
 
 90
 Turning to the first of the factors--the existence of public controversy over the NTSA--I do not believe BPA could reasonably have concluded that it had alleviated "most of the [public] concerns" surrounding the NTSA simply because the Fish and Wildlife Agreement may have satisfied "some commentators." Majority op. at 7657 (emphasis added). This reasoning is wholly unconvincing on its face: the appeasement of "some commentators" is hardly persuasive evidence that the Fish and Wildlife Agreement quelled public controversy to the point where an EIS was no longer required. To the contrary, it seems apparent that the Fish and Wildlife Agreement--BPA's only effort to address the effect of the NTSA on fish--failed sufficiently to address strongly held public concerns. Indeed, by issuing an EA instead of preparing an EIS, BPA has only given the public further cause for concern and added procedural objections to the substantive ones that previously existed.
 
 
 91
 I also believe that the EA was inadequate in light of its failure to consider the potential cumulative impacts from the proposed expansion of the Columbia Basin Project. "NEPA requires that where several actions have a cumulative or synergistic environmental effect, this consequence must be considered in an EIS." City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir.1990). Among the actions that may have a "cumulative or synergistic environmental effect" for purposes of this rule are " 'reasonably foreseeable future actions' taking place in the affected area"--in this case, the expansion of the Columbia Basin Project. Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d 1174, 1181 (9th Cir.1990) (quoting Sierra Club v. United States Forest Serv., 843 F.2d 1190, 1196 (9th Cir.1988)). Because there is at least a "substantial question[ ]" as to whether the combination of the Columbia Basin expansion and the extra storage capacity created by the NTSA may "significant[ly] degrad[e]" the salmon resources of the Columbia River, BPA was obligated to prepare an EIS before proceeding with the NTSA. LaFlamme, 852 F.2d at 397.
 
 
 92
 The majority responds that BPA need not have considered the potential cumulative effects from expansion of the Columbia Basin Project because any such effects will depend upon "how the non-Treaty storage will be allocated," which has yet to be resolved. Majority op. at 7660. I do not agree with the majority that petitioners' NEPA challenges can be deemed "premature." Id. at 7651. Here, unlike in the case of the alleged violation of the Northwest Power Act, we are looking not at whether BPA has by its past conduct failed to treat the fish equitably, but whether in making its decision to acquire additional storage capacity it has explored adequately the various ways of confronting its future problems. Under NEPA, the challenges are to the adequacy of the EA used to justify the decision to enter into the NTSA, not to whether the ultimate use of the added capacity is likely to be fair. It cannot be seriously disputed that by entering into the NTSA, BPA committed itself to do something with the extra storage capacity. The EA could and should have considered the potential cumulative impact from the possible uses of the non-Treaty capacity--namely, power and preservation--in conjunction with the planned Columbia Basin expansion; that is the very sort of educated hypothesizing that BPA engaged in when attempting to ascertain the potential cumulative impact from the combination of the Intertie expansion and the NTSA. Moreover, had BPA examined the issues fully as of the time it entered into the NTSA, it might have concluded that there were advantages to ensuring today that when the water is ultimately used, the usage will be environmentally sound, rather than waiting for a less auspicious moment sometime in the future to attempt to achieve that objective.
 
 
 93
 The majority also argues that an EIS was unnecessary in this case because the Bureau of Reclamation will eventually prepare a systems operation review and final EIS for the Columbia Basin Project. I do not see, however, how the prospect of the Bureau 's future compliance with the NEPA could have relieved BPA of its obligation at the time that it entered into the NTSA to consider the cumulative impacts from the Columbia Basin Project. Instead of requiring BPA to act with particular deliberation, the majority relieves BPA of its statutory obligation on the ground that BPA acted first. This perverse determination is simply incorrect. BPA, like the Bureau, was expressly obligated to consider potential cumulative impacts of all relevant actions including any "reasonably foreseeable" ones, such as the Columbia Basin Project. 40 C.F.R. § 1508.7.
 
 
 94
 Finally, BPA's failure to discuss the Fish and Wildlife Agreement in its EA or to allow public comment on the Agreement is yet another reason why the EA was inadequate, and why preparation of an EIS was necessary. NEPA obligates BPA to make relevant environmental information--including "[a]ccurate scientific analysis" and "expert agency comments"--"available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b) (emphasis added). BPA did not comply with this requirement: it signed the Agreement without any opportunity for public comment, and the final EA, which had been prepared long before, contained no discussion of the Agreement. The majority responds that BPA did not need to allow public comment or to discuss the Agreement in its EA because the Agreement was intended merely as "a means of alleviating the concerns of the fisheries community rather than as a means of mitigating environmental impacts." Id. The majority appears to reason that expert analysis and public discussion of the Agreement were unnecessary because the Agreement's sole purpose was to placate the public, and the document was not intended to alleviate environmental injuries. If the majority is correct, it becomes obvious why BPA was reluctant to expose the Agreement to expert or public scrutiny: the Agreement served no legitimate environmental function. The desire of an agency to shield its actions from view, however, only helps prove the need for searching scrutiny. And the majority undermines its own position in yet another respect: if the Fish and Wildlife Agreement is so practically ineffectual that no public comment or agency analysis of its effect was necessary, it is difficult to conclude that the Agreement quelled public controversy over the NTSA--unless one also concludes that the public was totally manipulated and deceived.
 
 
 95
 In sum, there are a number of reasons why I cannot agree that the EA was adequate, and that an EIS was unnecessary. My reasons begin with the sheer magnitude of the NTSA, as well as the fact of dwindling salmon populations in the Columbia River system and the sheer magnitude of the NTSA; they continue with the existence of the largely unabated public controversy over the NTSA; the EA's failure to consider the cumulative impacts from the proposed expansion of the Columbia Basin Project, if not also from the Intertie expansion; and the EA's failure to consider the actual effect of the Fish and Wildlife Agreement. All of these factors, singly and collectively, required an EIS in this case.
 
 
 96
 2. BPA Failed to Consider Reasonable Alternatives to Signing the NTSA.--I would also hold that even if an EIS were not required, BPA violated the NEPA by failing to "[r]igorously explore and objectively evaluate all reasonable alternatives" to the NTSA. City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir.1990) (quoting 40 C.F.R. § 1502.14). While consideration of all reasonable alternatives "is the heart of an environmental impact statement," 40 C.F.R. § 1502.14, NEPA requires agencies to "study, develop, and describe appropriate alternatives" even when preparation of an EIS is unnecessary. 42 U.S.C. § 4332(B), (E). The majority's explanation that BPA was not required to consider use of non-Treaty storage for fish because the NTSA only "governs BPA's rights to storage capacity in Canadian reservoirs" and "does not govern the allocation of water stored in those reservoirs," majority op. at 7662, misses the point entirely. The fact that BPA signed an open-ended agreement cannot be used to justify its failure to consider other possible approaches before doing so.
 
 
 97
 The question is, what alternatives were there to entering into an open-ended agreement that contains no guarantees of a fair allocation for fish? BPA could, for example, have signed an agreement earmarking at least some of the non-Treaty capacity to benefit fish, rather than leaving all of its allocation decisions entirely to those responsible for day-to-day operations. BPA responds that such an approach would have impaired its flexibility in allocating the extra capacity. Here it confuses its procedural obligations with its substantive goals. Flexibility is not such an overriding consideration that it can obviate the statutory requirement that alternative approaches be examined. Federal agencies must consider the variety of approaches that are available when making decisions that may affect the environment, even if they ultimately decide that some are impractical for reasons such as loss of flexibility. The very purpose of NEPA is to force agencies to take stock of environmental factors in their decisionmaking, and not automatically to reject potential courses of action without first assessing the relevant environmental concerns. By narrowing its objectives to flexibility and power generation, BPA impermissibly circumvented consideration of alternatives that would have guaranteed at least some benefit to fish from the outset. City of New York v. U.S. Department of Transp., 715 F.2d 732, 743 (2d Cir.1983); cf. City of Carmel-By-the-Sea v. U.S. Department of Transp., 95 F.3d 892, 907 (9th Cir.1996) (holding that agency abused its discretion by changing statement of purpose to eliminate all but one of the initial range of alternatives). The two alternatives that BPA did consider--signing the NTSA or not signing--allowed only the possibility of benefit to fish on an ad hoc basis. While I agree that BPA may yet, at a later date, fulfill its substantive obligation under the Northwest Power Act to provide the fish with equitable treatment, I see no justification for its failure even to have considered an alternative to the current version of the NTSA that would from the very outset have guaranteed some benefit for the fish.
 
 
 98
 I would remand to the BPA for preparation of a complete environmental impact statement, and for careful consideration of all reasonable alternatives to the current version of the non-Treaty storage agreement. Accordingly, I respectfully dissent from Part III of the majority opinion.
 
 
 
 [1]
 Petitioners are Northwest Environmental Defense Center (NEDC), Northwest Resource Information Center (NRIC), Idaho Steelhead and Salmon Unlimited (ISSU), and Salmon for All
 
 
 [2]
 Bonneville Power Administration (BPA), an agency of the Department of Energy, markets the hydroelectric power generated at a series of dams on the Columbia River and its tributaries
 
 
 [3]
 The Mid-Columbia is the section of the Columbia River from the Canadian border to its junction with the Snake River
 
 
 [4]
 The NPA allows the States of Idaho, Montana, Oregon, and Washington to each appoint two persons to serve on the Council. 16 U.S.C. § 839b(a)(2)
 
 
 [5]
 The parties also dispute whether the agreement with BC Hydro violates the United States-Canada Columbia River Treaty. At oral argument, petitioners conceded that this issue is not properly before us
 
 
 [6]
 NEDC submitted the affidavit of its president, Karl Anuta, in which he declares that:
 I have visited and intend to continue visiting sites along the Columbia River and many of its tributaries for recreational and aesthetic purposes, including the purpose of fishing for salmon and steelhead. Many times I have been joined in these excursions by fellow my fellow members of NEDC. Favorite sites in the Columbia Basin were I enjoy fly fishing for both salmon and steelhead include: the Deschutes River, Oregon; the Grande Ronde River, Oregon and Washington; the Wind River, Washington; and the Washougal River, Washington.
 In addition to fishing for anadromous fish, I enjoy watching them as they struggle upstream to spawn. It also brings me great pleasure to watch the salmon spawn in the wild along the Columbia River and its tributaries.
 NRIC submitted the affidavit of its executive director, Ed Chaney, in which he declares that:
 NRIC has worked as a professional consultant for national, regional, state, and tribal fish agencies on Columbia and Snake River salmon issues and, since its inception, has consistently advocated reform of the Federal Columbia River Power System operations to improve in-river condition for and mitigate harm to migrating salmon....
 NRIC's corporate function and purposes depend substantially on the continued survival of these species; thus federal actions that threaten extirpation of these fish also risk significant harm to NRIC's primary function and goals.
 ISSU submitted the affidavit of its executive coordinator, Mitch Sanchotena, in which he declares that:
 ISSU is a non-profit, educational, scientific and charitable organization. It was formed in 1985 to unite concerned citizens, sport fishermen, and conservationists for the purpose of restoring, preserving, and protecting Idaho steelhead and salmon populations and habitat....
 The vast majority of ISSU members engage in sport fishing.... I have personally fished for sport in Idaho since 1951. I fished for salmon prior to 1978. I formerly fished for summer chinook on the South Fork of the Salmon River, and for spring chinook on the Middle Fork of the Salmon River and the upper Salmon River. I continue to fish the main river for steelhead. I was a licensed fishing guide from 1979 through 1990.
 Salmon for All submitted the affidavit of Thane Tienson, in which he declares that:
 Salmon for All has been in existence for approximately 30 years and represents and is the voice of the lower Columbia River Commercial salmon fishing industry. Salmon for All is comprised of members who are licensed Columbia River commercial salmon fishers and licensed salmon processors on the river.
 Salmon for All is funded by a poundage fee assessed upon its member fishers and processors such that Salmon for All benefits by increased numbers of fish caught by its fishers and, conversely, suffers financial injury if the numbers of harvested salmon diminishes.
 
 
 [7]
 Petitioners also argue a third basis for injury. They argue that the NTSA Fish Agreement does not provide for suspending non-Treaty storage operations pursuant to the NTSA in the event of alleged or actual violations of the NTSA Fish Agreement. From this argument, petitioners claim they are currently suffering injury from the agreements because CBFWA has alleged nineteen violations of the Agreement by BPA since 1991. However, because they are challenging only the decision to enter into the agreements, and are not suing for violations of the agreements, we do not consider this ground
 
 
 [8]
 BPA also cites Marathon Oil Co. v. United States, 807 F.2d 759, 767 (9th Cir.1986), for the proposition that, "[a]s a general rule, we will not consider issues not presented before an administrative proceeding at the appropriate time." Insofar as Marathon Oil can be read to require exhaustion of administrative remedies before bringing a claim in federal court under section 10(c) of the APA, 5 U.S.C. § 704, it has been modified by the Supreme Court's decision in Darby v. Cisneros, 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) (holding that a court's authority to require exhaustion of administrative remedies in actions brought under the APA is limited when neither the statute nor agency rules specifically mandate exhaustion as a prerequisite to judicial review)
 
 
 [9]
 Section 839d(1) provides:
 The Administrator is authorized and directed to investigate periodically opportunities for mutually beneficial interregional exchanges of electric power that reduce the need for additional generation of generating capacity in the Pacific Northwest and the regions with which such exchanges may occur. The Council shall take into consideration in formulating a plan such investigations.
 16 U.S.C. § 839d(l)(2).
 
 
 [10]
 Section 6(c) provides, in relevant part:
 For each proposal under subsection (a), (b), (f), (h), or (1) of the section to acquire a major resource, to implement a conservation measure which will conserve an amount of electric power equivalent to that of a major resource, to pay or reimburse investigation and preconstruction expenses of the sponsors of a major resource, or to grant billing credits or services involving a major resource, the Administrator shall [follow notice and comment procedures and submit a written decision to the Council].
 16 U.S.C. § 839d(c)(1).
 
 
 [11]
 The Intertie is a system of high voltage lines transmitting federal and non-federal power between the Pacific Northwest and the Pacific Southwest. California Energy Comm'n v. Bonneville Power Admin., 909 F.2d 1298, 1302 (9th Cir.1990)
 
 
 [12]
 A bypass is a structure that allows fish to move through or around a dam without going through the turbines
 
 
 [13]
 In response to criticisms of the FISHPASS model, BPA stated:
 BPA believes it uses the best model available for assessing biological impacts in a science in which all knowledge is not precise. Scholarly papers and journals which have explored the use of models for this purpose have reached the same conclusion. BPA has offered to explore other computer or like tools if offered. The commenters are uniformly critical of BPA's approach but offer no alternative of their own. BPA continues to believe that it should use the best tools available to it to measure anadromous fish impact.
 "Non-Treaty Storage Agreement Issue Summary and Response to Comments," O.R. at 150.